# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| A.J. AMER AGENCY, INC. | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | C.A. No. 12-351S |
| | : | |
| ASTONISH RESULTS, LLC, | : | |
| Defendant. | : | |

## REPORT AND RECOMMENDATION

Patricia A. Sullivan, United States Magistrate Judge

> There is a great principle which I think ought to be adhered to by this court and every court where it can possibly do so; that is to say that a man shall abide by his contracts and that a man's contracts should be enforced as against him.
>
> - The Honorable Harlan F. Stone.[1]

Plaintiff A.J. Amer Agency, Inc. ("Amer"), and Defendant Astonish Results, LLC ("Astonish") are locked in a battle royal over a Marketing Agreement that required Astonish to supply Amer with a website, digital marketing support and training and consulting services. Amer contends that it was induced by fraud to sign the Marketing Agreement and that the Marketing Agreement is voidable as an unconscionable contract of adhesion and for a host of other reasons. Amer also claims that Astonish materially breached some of its promises. Amer's complaint seeks rescission, a declaration that the Marketing Agreement is canceled, void or unenforceable, and the return of its money, in addition to damages for the breach.

Astonish argues that the Marketing Agreement accurately lays out its commitments and that it was in the early stages of performing as promised when Amer, in a pique over misperceived wrongs and with a strong dose of buyer's remorse, prematurely ceased its

---

[1] Harlan F. Stone, The "Mutuality" Rule in New York, 16 Colum. L. Rev. 443, 463-64 (1916) (quoting Biggs v. Hoddinott, [1898] 2 Ch. 307 at 313 (Romer, J.) (Eng.)).

contractual duty to work with Astonish and brought this suit. Astonish points out that Amer got, and is still using, the Astonish-constructed website; further, Astonish was in the process of implementing the digital marketing system and had offered training and consulting services but Amer breached its duty to assist with these efforts and then repudiated the Agreement before it could reap the expected benefits. Astonish asserts a counterclaim based on Amer's failure to devote substantial efforts to assisting Astonish with implementation and its unjustified repudiation. Because Amer paid in advance for the five-year Marketing Agreement, Astonish's potential recovery is limited to nominal damages and contractual attorney's fees.

Both Amer and Astonish have moved for summary judgment; both motions have been referred to me for report and recommendation. Amer's motion seeks judgment in its favor and against Astonish on all of Amer's claims and Astonish's counterclaim. Astonish seeks summary judgment in its favor and against Amer on all of Amer's claims, but not on its own counterclaim.

Presented by these combatants with an extensive factual record, I have meticulously slogged through five hundred ostensibly undisputed facts, seventy-three exhibits and close to two thousand pages of deposition testimony. Boiled to the essence, I find that Amer and Astonish have viable claims against each other for breach of some of their respective obligations and related duties of good faith and fair dealing under the Marketing Agreement. As to the rest, Amer has set out a dense thicket of facts to support its array of theories for how every sentence uttered during the sales process amounted to fraud to induce it to sign the Marketing Agreement and why the Marketing Agreement is an unconscionable contract of adhesion and void for seemingly every reason imagination can conjure. With apologies to the reader, this report and recommendation journeys through a detailed examination of every fact, every theory, every claim. The excursion ends in the conclusion that, as a matter of law, Amer and Astonish entered

into an enforceable contract; Amer has failed to proffer competent evidence to support any of its many theories for rescinding or canceling the Marketing Agreement. What should be left for trial is relatively simple. Except for Amer's claim that Astonish failed to deliver the website it promised, I recommend that Amer's breach of contract and good faith and fair dealing claims proceed to trial. I likewise recommend that Astonish's counterclaims for breach of contract and violation of its duty of good faith and fair dealing present triable issues. The rest should end now.

In line with this thinking, and based on the reasoning below, I recommend that Astonish's Motion for Partial Summary Judgment (ECF No. 53) be GRANTED IN PART AND DENIED IN PART and Amer's Cross-Motion for Summary Judgment (ECF No. 55) be DENIED.

## I.   <u>BACKGROUND FACTS</u>[2]

I lay out the factual background of the case here and supply more specifics in the separate analysis of each claim. These facts are undisputed unless a dispute is noted; they are stated in a manner drawing all reasonable inferences in favor of the nonmoving party. See <u>514 Broadway Inv. Trust, UDT 8/22/05 ex rel. Blechman v. Rapoza</u>, 816 F. Supp. 2d 128, 131 (D.R.I. 2011).

---

[2] These facts are derived from the parties' Statements of Undisputed and Disputed Facts (cited respectively as "PSUF ¶ __," "PSDF ¶ __," "DSUF ¶ __" and "DSDF ¶ __"), from the deposition testimony (cited as, for example, "Amer Dep. at __"), from Hamilton Amer's Affidavit filed in support of Amer's motion ("Amer Aff ¶ __") and from other evidence filed in support of the motions (cited as "ECF No. __"). Occasionally, the parties referred to evidence based on the bates number used as the documents were exchanged in discovery; since the Court has no access to the discovery exchanged by the parties, those references were disregarded. In addition to the material submitted with the motions, I directed the parties to provide copies of the depositions taken in the case. Our Circuit Court has held that deficiencies in the parties' summary judgment papers do not prohibit this Court from exercising discretion to review record evidence that is not pinpointed by the parties to determine whether a material fact is disputed. <u>Stepanischen v. Merchs. Despatch Transp. Corp.</u>, 722 F.2d 922, 930 (1st Cir. 1983) ("Although the court in a proper case may . . . establish ground rules that facilitate the search for an issue of material fact, the rule itself does not limit the court's examination to issues raised in affidavits or to record evidence pinpointed in the parties' memoranda."); <u>see also</u> Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record."); <u>Hillman v. Shelby Cnty.</u>, 515 F. App'x 365, 370 (6th Cir. 2013) (district did not err in reviewing deposition testimony not cited by the parties). I relied on these transcripts as indicated in the text.

## A.     Astonish

Astonish is a Rhode Island limited liability company that sells its internet-based marketing system to hundreds of independent insurance agencies around the United States.  ECF No. 17-1 at 6; DSUF ¶ 1 (first sentence); PSUF ¶ 2.  An insurance agency entering a contract with Astonish is asked to sign a two-page Terms and Conditions Agreement, which incorporates by reference a ten-page Project Proposal.  ECF No. 17-1 at 2-13.  The Terms and Conditions Agreement sets out the basic legal terms of the relationship, while the Project Proposal describes the interrelated components of the services that Astonish provides.  For clarity, I refer to the complete contract, which includes both the Terms and Conditions Agreement and the Project Proposal, as "the Marketing Agreement."  See DSUF ¶ 36.

The Astonish business model is based not only on supplying its customers with a customized website built on a template, and other internet-based resources, but also in cheer-leading them through the painful transition from analog advertising to electronic marketing.  See Donahue Dep. at 37-38; ECF No. 58-16 at 50-52.[3]  Astonish teaches its insurance agency customers to exploit the potential of the internet and, more recently, social media.  See Donahue Dep. at 62-63.  In alignment with this theme, the Marketing Agreement is drafted to create excitement about the prospect of change, to prepare agencies to accept the pain of change and to nudge reluctant and sometimes hostile agency employees to embrace the use of electronic marketing tools.  As one of Amer's owners understood, an insurance agency like Amer is in for a seismic "cultural change" when it signs the Marketing Agreement.  DSUF ¶ 89; ECF No. 58-16 at 50-51.

---

[3] The transcript of Astonish's September 27, 2011, sales presentation to Amer starts on CM/ECF as ECF No. 58-15 and continues on ECF No. 58-16.  To assist the reader, references to this presentation are cited to the particular ECF number (58-15 or 58-16) and the specific page of the transcript on which the citation occurs.

B. **Amer**

Amer is a successful independent insurance agency based in Akron, Ohio,[4] that specializes in commercial insurance; started by Hamilton Amer's father, it has been doing business for at least thirty-eight years. DSUF ¶¶ 2, 12; PSUF ¶ 1; Amer Dep. at 6. Amer is owned by Hamilton Amer, who is its Chief Executive Officer, and by a minority shareholder, Charles Tennent, who is its President.

Prior to signing the Marketing Agreement, Amer was not using internet-based tools to market its services, except for a "simple" website. Amer Dep. at 3-4, 12. At some point in 2011, Mr. Amer decided that Amer needed to step into the foreign (to it) waters of internet-based marketing and advertising because "we thought marketing on the Internet was the thing that was in the future, it was something that we should get involved in." DSUF ¶¶ 19-20; Amer Dep. at 11. To explore options, Mr. Amer looked at internet advertising by other insurance agencies. DSUF ¶ 21. He spoke to a nearby Ohio insurance agency about its website; that agency recommended Astonish, which had built the site using its template. Amer Dep. at 7-8. He also contacted a Pennsylvania agency with an Astonish website. DSUF ¶ 22. In light of Mr. Amer's subsequent claims of false promises that induced him to sign the Marketing Agreement, it is notable that Mr. Amer asked this Pennsylvania agency about the business it generated as a result of the agreement with Astonish and was told it had not added much new business and had

---

[4] This simple background fact – that Amer is an insurance agency based in Akron, Ohio – illustrates the difficulty faced by this Court in grappling with these motions. Astonish lists this information as its second undisputed fact, without a record citation, which is permitted by DRI LR Cv 56(a)(2) when the fact is acknowledged by opposing counsel to be undisputed. Although this fact is both material and undisputed as it comes from Amer's First Amended Complaint, Amer moved to strike it for the lack of a record citation along with sixty other listed facts that purportedly lack a record citation. Amer then presents the precise same fact – verbatim – as the first paragraph in its list of undisputed facts, also without citation. Amer's motion to strike similarly challenges facts that refer to the absence of evidence, so that no record citation is possible. See, e.g., DSUF ¶¶ 176-77, 196, 199, 213, 233, 239-40, 249. I decline to wade into these troubled waters. Amer's motion to strike, improperly buried in its Opposition to Defendant's Motion for Partial Summary Judgment in violation of DRI LR Cv 7(a), is denied.

struggled to put up the Astonish website. Amer Dep. at 30-31. Also important in light of how Mr. Amer claims he was deceived, from his due diligence, Mr. Amer learned "what the [Astonish] websites looked like." Amer Dep. at 15. As a result, he contacted Astonish about the possibility of doing business. DSUF ¶¶ 21-23; Amer Dep. at 9-11.

      **C.**      **Astonish's September Sales Presentation to Amer**

On September 27, 2011, Astonish presented a sales webinar over the internet for Amer; Mr. Amer and Mr. Tennent attended and were able to ask questions. DSUF ¶¶ 24-25; PSUF ¶ 5. The audio of the presentation is captured in a transcript so there is no ambiguity as to what was said. ECF Nos. 58-15 & 58-16.

During the September sales presentation, the Astonish representative demonstrated some components of the Astonish system. ECF Nos. 58-15 at 20-21, 27-28; 58-16 at 29. He provided data and information regarding the business success experienced by several named Astonish customers. ECF No. 58-15 at 21-22. The presenter reminded Amer that Astonish serves five hundred insurance agencies across the country. ECF Nos. 58-15 at 19, 20; 58-16 at 30, 33. The presentation touched on the support Astonish provides to its insurance agencies to assist with improving their rankings on search engines such as Google. ECF No. 58-15 at 23-24. Astonish's support for email marketing was discussed. ECF No. 58-15 at 25. At the close of the presentation, the Astonish representative emphasized that "the biggest challenge that we have, is getting an agency that's been doing the same thing for the last 25 years to start to do some things a little bit different." ECF No. 58-16 at 51.

Some of the colloquy at this presentation is significant in light of Amer's claims. For example, Amer employees pressed the Astonish representative to specify "how much revenue can we expect to generate on this?" ECF No. 58-16 at 55. The Astonish representative refused

to give an answer, responding, "we've never told any of our 500 agencies here's exactly what you can expect in month three, month six, month nine, 'cause it's just impossible for us to determine that, it really is." ECF No. 58-16 at 59. Regarding pay-per-click advertising on Google, the representative told Amer, "you pay for it . . . we help our agencies manage all that." ECF No. 58-15 at 20-21. With respect to social media, the Astonish representative explained that there is "a certain amount of posting that we do for the agency, a certain amount of blogging that we do . . . ." ECF No. 58-15 at 26. Amer's *post hoc* read of the transcript of the September sales presentation pulls out of context other comments by the Astonish representative such as, "[w]e . . . do all the pay-per-click campaigns for [the agencies]," and we "also handle all the agencies' social marketing." <u>See generally</u> PSUF ¶¶ 8-15.

After the September sales presentation, Amer decided it was interested in doing business with Astonish and agreed to a second sales presentation, this one to be conducted at Amer's Ohio office. Astonish sent Amer a list of references to contact about its services and other information to help prepare for the next sales presentation. DSUF ¶¶ 26, 27. The presentation was to be given by an Astonish employee, David Buckley, who traveled to Ohio for that purpose.

### D. Astonish's October Sales Presentation to Amer

Mr. Buckley's sales presentation was on October 7, 2011. Unlike the September presentation, there is no transcript of what was actually said.

I focus first on Amer's various versions of what happened. Mr. Amer testified that Mr. Buckley's statements caused him to conclude that Astonish would "take care of our social media," by which he claims he understood that Astonish would write all the postings and tweets, and Amer would do nothing. Amer Dep. at 18, 21-22, 81. Mr. Tennent testified that Mr. Buckley said that Astonish was going to do everything "from soup to nuts . . . we didn't have to

do anything . . . and revenue was going to flow in the door," but also said he did not believe it. Tennent Dep. at 37. Although he already knew "what the Astonish websites looked like," Mr. Amer's Affidavit claims Mr. Buckley promised a totally unique website, unlike any other Astonish site. Amer Aff. ¶¶ 4, 11(ii). One Amer employee recalled hearing Mr. Buckley guarantee that Amer would "very quickly" earn a positive "return on its investment"[5] in the Marketing Agreement. PSUF ¶¶ 74, 76. Mr. Amer's Affidavit adopts this version, Amer Aff. ¶¶ 6, 11, which contrasts with his testimony that Mr. Buckley caused him to expect a positive return within a year. Amer Dep. at 38-39. With respect to ranking on search engines like Google, Mr. Amer testified that Mr. Buckley promised "everything we needed to give us front page [search engine] rankings," while Mr. Tennent recalled that Mr. Buckley "mentioned that he would have us in the top three slots." Amer Dep. at 20; Tennent Dep. at 40. Mr. Amer's Affidavit claims a promise (not attributed to Mr. Buckley) of pay-per-click paid for by Astonish, Amer Aff. ¶ 11(v), but at his deposition, Mr. Amer said he gave Mr. Buckley credit card authorization for up to $10,000 to be paid for pay-per-click advertising. Amer Dep. at 19. Finally, Mr. Amer's Affidavit says Mr. Buckley told him the Marketing Agreement could be canceled at will, while his deposition omits that representation from his list of untrue Buckley statements. Compare Amer Aff. ¶ 12, with Amer Dep. at 21, 22, 27. Other Amer employees at the Buckley presentation denied hearing a discussion of the cancelability of the Marketing Agreement. DSUF ¶ 294.

     Not surprisingly, Mr. Buckley's testimony about what happened is different. He claimed he advised Amer to have one of its employees do the social media blogging and posting because social media is an extension of the agency; while Astonish will do some, it should not do all.

---

[5] "Return on investment" is a phrase Astonish uses to refer to the business benefits an agency can gain from the Marketing Agreement. See PSUF ¶ 74.

Buckley Dep. at 49, 115-16.  He specifically denied that he told Amer that Astonish would do all

of its Facebook posting and blogging.  Buckley Dep. at 115.  He denied that he told Amer that

the Marketing Agreement would require very little effort by Amer, though he did say that some

of the Astonish software would automate work that would otherwise have to be performed by

Amer's employees.  Buckley Dep. at 106, 116-18, 168.  He admitted he told Amer it would earn

a positive return on its investment in the Marketing Agreement, but only to the extent that it used

the components of the Astonish system, and that the time required to achieve positive results

depended on the agency.  Buckley Dep. at 206.  He claimed he told Amer that search engine

ranking optimization takes twelve to eighteen months, requires a blended strategy and some

Astonish customers get to the top while other do not.  Buckley Dep. at 110-12.  As to pay-per-

click, Mr. Buckley said he told Amer that Astonish would pay for the first ninety days, after

which the agency would decide whether it wanted to pay for more.  Buckley Dep. at 97-98.

Finally, he said he interprets the Marketing Agreement as noncancelable for the entire Initial

Term, but was never asked if he discussed that with Mr. Amer.  See Buckley Dep. at 179.

### E.    Amer's Signing of the Marketing Agreement

After the presentation, Mr. Buckley gave Mr. Amer the Marketing Agreement and told

him that he (Mr. Buckley) had to leave for the airport and that the reduced price Astonish was

quoting was available that day only.[6]  Amer Dep. at 33.  Mr. Amer claims that the Project

---

[6] Mr. Amer blames Astonish for his failure to read the Marketing Agreement or to review it with legal counsel, labeling Mr. Buckley's same-day flight home as a sales tactic.  Amer Dep. at 33; Amer Aff. ¶¶ 2-3.  In light of Mr. Amer's status as a sophisticated business owner of a commercial insurance agency, I attach no legal significance to the offer of a discount for one day only or the timing of Mr. Buckley's flight.  Nash & Powers Ins. Servs., Inc. v. Astonish Results, LLC, No. 2:13-CV-257, slip op. at 6 (E.D. Tenn. May 16, 2014) ("At no point in time did [the plaintiff] have to sign any contract, no matter how much 'pressure' [Astonish's agent] may have applied by making Astonish's offer 'take-it-or-leave-it.'"); 1-Stop Fin. Serv. Ctrs. of Am., LLC v. Astonish Results, LLC, A-13-CA-961-SS, 2014 WL 279669, at *7 (W.D. Tex. Jan. 23, 2014) ("[The insurance agency's] failure to take sufficient time to read the terms of the contract carefully or have counsel review them is nobody's fault but its own."); cf. In re Amrep Corp., 102 F.T.C. 1362, 213 (1983) (sales tactics discouraging buyers from taking contract home may amount to unpleasant hard sell, but are not, without more, legally unfair).

Proposal was not attached to the Terms and Conditions Agreement. He admits he received it, but says he cannot recall when he got it in relation to when he signed.[7] Amer Dep. at 32-34. It is undisputed that Astonish would not have agreed to any alteration of the preprinted terms, nor is there any evidence that Amer tried to negotiate any of them. PSUF ¶¶ 38-39.

Mr. Amer had discussed the decision whether to enter an agreement with Astonish the day before the Buckley presentation with his co-owner, Mr. Tennent, who told Mr. Amer he had reservations. Tennent Dep. at 20; DSUF ¶ 39. Mr. Tennent believed that Mr. Buckley had promised what could not be delivered and that he was a snake oil salesman, but did not share his impression with Mr. Amer because he (Mr. Tennent) left the meeting for an appointment. Tennent Dep. at 16-17, 27, 33. Despite his co-owner's misgivings and without waiting for an opportunity for further consultation with him, Mr. Amer signed the Marketing Agreement, without bothering to read it or review it with Amer's legal counsel. PSUF ¶ 34; Amer Dep. at 32-33. Apparently, Mr. Amer actually signed both a three-year version and a five-year version of the agreement; after consulting with Mr. Tennent, Amer decided to go with the longer five-year Marketing Agreement. DSUF ¶¶ 33-34. An email exchange between the two Amer owners initiated by Mr. Amer right after he signed the Marketing Agreement is telling. Mr. Amer states, "The system requires very little input on our part – just consistent monitoring and updates to the status of prospects." ECF No. 41-10 at 50.[8] In response, Mr. Tennent reminds Mr. Amer of

---

[7] Amer's Undisputed Fact No. 80 states that Mr. Amer did not receive the Project Proposal until after he signed the Marketing Agreement and cites to page 33 of Mr. Amer's deposition where he states, "It was given to me after I signed the agreement . . . ." Amer Dep. at 33; PSUF ¶ 80. Amer omits the very next page of the transcript where Mr. Amer corrected this testimony, answering twice that he could not recall when he got the Project Proposal in relation to when he signed the Marketing Agreement. Amer Dep. at 34.

[8] Based on a stipulation of the parties that certain documents – not this one – would be restricted from public viewing on the ECF system, this document was restricted from public viewing in error. See ECF No. 49. It is referred to openly in Defendant's Statement of Undisputed Facts ¶ 89, without objection. Accordingly, I refer to it in this report and recommendation.

what was said in the Buckley sales presentation, that the Agreement "will require a cultural change where everyone must sell" and that "you and I need to lead this process" and if "employees do not jump on we need to find employees who will."  ECF No. 41-10 at 50; DSUF ¶ 89.

Sometime after Mr. Amer signed the Marketing Agreement, Amer paid Astonish $152,475, which was the full price for the five-year Initial Term after application of an agreed-upon discount.  PSUF ¶ 84.

## F.   **The Astonish/Amer Marketing Agreement**

The Marketing Agreement that Mr. Amer signed without reading is critical to these motions and I spell out its terms in detail.

The Terms and Conditions component of the Marketing Agreement uses legalistic language to establish the license agreement for use of the software and any equipment, setting out the Initial Term of five years, reciting the monthly price and requiring that the entire price (the monthly fee multiplied by the number of months in the "Initial Term") be paid up front.  It imposes the duty on the insurance agency to "devote substantial effort assisting Astonish in good faith with the design, development and production of the Equipment and/or Software License."  ECF No. 17-1 at 2.  It includes an integration clause, which states:

> **Entire Agreement:**  This Agreement, together with the Project Proposal, contains the entire agreement and understanding between [Amer] and Astonish relating to the Equipment and/or Software License and the subject matter hereof, and supersedes any other agreement or understanding, whether written or oral, relating thereto.

ECF No. 17-1 at 3.  Mr. Amer's signature appears on the same page as this integration clause.

The integrated Project Proposal is incorporated by reference into the Marketing Agreement; its language and tone are starkly different from the Terms and Conditions, lacking

the precise language customary in a business contract. The Project Proposal lays out the

interrelated core components of the Astonish system:

1) <u>Website</u>. Astonish will design and host a customized website built on a "Content Management System," known as the "Virtual Insurance Office," with high-end graphics, custom animation and lead-converting forms.

2) <u>Software</u>. Astonish will set up a "Virtual Profit Center" or "VPC," a web-based marketing management tool that monitors agency activity, tracks customer activities and in-coming calls and conducts automated email marketing and customer relationship management functions.

3) <u>Email</u>. Astonish will provide power automated email campaigns, auto-responding messages and email templates with target specific content.

4) <u>Telephone</u>. Astonish will set up a "Virtual Phone Manager" with two toll free numbers to track and record calls to the Virtual Insurance Office website.

5) <u>Search Engine Optimization</u>. Astonish will develop a comprehensive blended strategy for "search engine optimization"[9] or "SEO," based on research done by Astonish, to help the agency to obtain "great SEO placements and rankings that are meaningful and lasting."

6) <u>Search Engine Marketing</u>. Astonish will focus on leveraging the most effective keywords and placements for "Search Engine Marketing"[10] or "pay-per-click," to generate "the most traffic at the lowest cost."

7) <u>Partners Program</u>. Astonish will install its Partners Program to allow the agency to highlight local businesses.

8) <u>Reporting</u>. Astonish will supply monthly site statistics reports and professional support to analyze statistics and implement improvements.

9) <u>Social Media</u>. Astonish will help the agency to create accounts on most of the popular social media platforms, including coaching on executing an effective social media campaign.

---

[9] "Search Engine Optimization" is the process to raise the visibility of a website on a search engine's unpaid search results. It uses keywords designed to generate traffic to a website and obtain favorable internet placements and rankings. ECF No. 58-5 at 14; Donahue Dep. at 85.

[10] "Search Engine Marketing" is a form of internet marketing that promotes a website through paid internet advertising and marketing. ECF No. 58-5 at 14.

10) <u>Dedicated Support</u>.  Astonish will assign a dedicated marketing representative and project manager known as a "Raving Fan Manager" to provide consistent feedback and to act as the main point of contact at Astonish.

11) <u>Training, Coaching and Networking</u>.  Astonish will provide personalized onsite and offsite training, including a weekly video message and access to other Astonish customers.

ECF No. 17-1 at 7-11.  A blended strategy using all of the listed core components is described in the Agreement as essential to effectively market insurance products to the modern consumer. ECF No. 17-1 at 7.  For one component, the website, the Agreement required Amer to notify Astonish that it did not accept the website within ten days after launch to the public; if there is no notification of non-acceptance, the website is deemed to have been accepted.  ECF No. 17-1 at 2.

These core services are not all-inclusive.  Rather, the Marketing Agreement states that they "are just some of the tools Astonish provides."  ECF No. 17-1 at 7.  For example, Astonish offers other services not mentioned in the Marketing Agreement, such as continuing education seminars for agents.  PSUF ¶¶ 6-7.  In addition, the Marketing Agreement provides that, as Astonish makes upgrades and enhancements to its system, these will automatically be made available to its customers.  ECF No. 17-1 at 10.  Consistent with this commitment, Astonish strives to keep its offerings in synch with the rapidly changing internet; as a result, its services are constantly evolving.  DSUF ¶¶ 237-38.  For example, when Google adjusted its algorithm so that third-party blogging became less effective in improving search engine ranking, Astonish calibrated its service to meet the new challenge and ran trainings to inform its customers of the new development.  DSUF ¶¶ 189-91; PSUF ¶¶ 66-67.  Similarly, as social media has matured as a marketing resource, Astonish adjusted its approach.  Donahue Dep. at 154; Sawyer Dep. at 101; DSUF ¶ 183.  Because of this fluidity, the Marketing Agreement does not purport to be a static all-inclusive description of everything that Astonish does for its insurance customers.

The Marketing Agreement emphasizes that time and effort are required to reap the benefits of the Astonish system – there is "no pill or quick fix for generating incredible results" and "changing your culture and business model does NOT happen overnight." ECF No. 17-1 at 7, 12 (emphasis in original). It includes a timeline to "help[] manage expectations." ECF No. 17-1 at 12. Colorfully described as "Crawl, Walk, Run," the Agreement states that the first year is when the agency lays down the foundation for results that will not come until the second and third years. Id. With respect to search engine optimization, the Agreement's articulated goal is that, by year three, "your [website] is readily found for your 20 top keywords." ECF No. 17-1 at 12. With respect to social media, in year one, the Marketing Agreement is clear that the agency must find its own employee to do the postings – "[f]ind a social media engineer and develop a solid social media strategy." ECF No. 17-1 at 12.

Consistent with the need for several years to yield results, Astonish offered Amer an agreement for an Initial Term of either three or five years at its option. With Mr. Tennent's approval, Mr. Amer chose five years, filling in the blank for the "Initial Term" with "60" months. In a provision flawed by an obvious error, the Marketing Agreement states that, during "the term," it is "non-cancelable:" the clause establishing that the Agreement is non-cancelable appears just below the provision defining the length of the Initial Term, but it states, "[t]his Agreement shall be non-cancelable for the term set forth below." ECF No. 17-1 at 2 (emphasis supplied). This sentence appears to be a survivor of an edit to the Marketing Agreement that moved the Initial Term from below this sentence to its current position above. Mr. Buckley testified that this sentence refers to the Initial Term, even though that is set out immediately above the quoted sentence, not below. Buckley Dep. at 179. Amer disagrees with this interpretation. Congruent with the proposition that the Marketing Agreement is non-cancelable

for the Initial Term, the next section states that written notice of termination must be provided sixty days prior to the end of the Initial Term or the Marketing Agreement will automatically renew for a one-year period; in addition, the price for the entire term is required to be paid in advance. ECF No. 17-1 at 2.

The last page of the Marketing Agreement contains a list of "10 Things You [the insurance agency] MUST DO in order to grow." ECF No. 17-1 at 13 (emphasis in original). Several are material to Amer's claims. For example, the Marketing Agreement stipulates that the insurance agency "MUST invest in marketing" and "MUST use social media and blog frequently. If you can't do it yourself, hire someone who can . . . ." ECF No. 17-1 at 13. Consistent with the theme of cultural change, the Marketing Agreement states, "You MUST try new things if you want to grow" and "You MUST embrace change and not fear it." ECF No. 17-1 at 13. Overall, the Marketing Agreement is pellucid that positive results from the investment in the Astonish system will take time and work on the part of the insurance agency.

### G. Early Performance and Amer's Repudiation of the Marketing Agreement

As soon as the Marketing Agreement was signed, Astonish immediately set about performing its many obligations. It created a customized website with a new logo for Amer. DSUF ¶¶ 48-55. Mr. Amer approved the colors and set-up for the site on November 22, 2011, and it was altered based on his comments; on December 19, 2011, the new site went live. DSUF ¶¶ 51-55. After all his changes were implemented, Mr. Amer had no other objections. DSUF ¶¶ 51-54. Amer never notified Astonish that it had not accepted the website. DSUF ¶ 57.[11] Amer is still using the Astonish website. Amer Dep. at 44; Tennent Dep. at 74; DSUF ¶ 271.

---

[11] Amer purports to dispute this fact by reference to the cancelation letter dated June 20, 2012, written by its counsel. However, the letter makes no reference to non-acceptance of the website. I treat this fact as undisputed.

Astonish search engine engineers consulted with Amer about its business goals and developed a list of target keywords, which Astonish placed on the Amer website and began to track. DSUF ¶¶ 60-63. Within a short period of time, Amer's search engine ranking improved with respect to several of its keywords. DSUF ¶¶ 260-61, 267-70. Despite the dispute over if and when Amer would be charged for pay-per-click, there is no evidence that Amer was ever charged for or even asked for pay-per-click that Astonish would not provide. DSUF ¶ 312. Astonish installed the Virtual Phone Manager[12] and its consulting service prepared a written assessment of the agency. DSUF ¶¶ 64, 66. Astonish offered training, coaching and consulting opportunities to Amer: while Astonish complains that Amer's haphazard participation in training breached its obligation under the Marketing Agreement and Amer complains about the quality of the training, by February 2012, three employees had attended "Basic Online Training," six had viewed the "Boot Camp Webinar," and six had attended "Silver Online Training." DSUF ¶ 90. Mr. Amer himself attended an Astonish seminar presented in Rhode Island. DSUF ¶¶ 65,[13] 82.

The parties hotly dispute the extent of Amer's commitment to do the work necessary to make the Astonish relationship effective. Astonish points to substantial evidence that many of Amer's employees had a bad attitude towards the system. DSUF ¶¶ 99-101. However, it also is undisputed that Astonish's early stage performance of its obligations under the Marketing Agreement was marred by the inadequate performance of the Astonish employee assigned as

---

[12] At his deposition, Mr. Amer complained in passing that Amer got only one, not two, toll free numbers. Amer Dep. at 45. This does not reappear as a claim – I disregard it.

[13] Amer disputed this fact. However, its record citation is to the Affidavit of Mr. Amer, which makes no reference to training, coaching and consulting. Since Mr. Amer's testimony is clear that he did attend a seminar in Rhode Island, I treat this fact as undisputed. Amer Dep. at 23.

Amer's dedicated Raving Fan Manager[14] – she was unhelpful and unresponsive, in short, a dud. Amer Dep. at 47; Donahue Dep. at 94-95; PSUF ¶¶ 98-99; DSUF ¶ 113. As a result, Amer became exceedingly frustrated by the delays and missteps in Astonish's attempt to upload Amer policy information onto the VPC, although Astonish contends the trouble stemmed from Amer's failure to assign a knowledgeable and qualified employee[15] to assist with the task. DSUF ¶ 113; Amer Dep. at 81. Amer was also dissatisfied with the level of support Astonish provided with respect to social media; although Astonish did some Facebook and Twitter postings and blogging, Amer found them disappointing because the content was the same as what was done for other agencies. PSUF ¶ 73. While Astonish did email marketing for Amer, there were problems. Bedell Dep. at 54.

At the Astonish seminar that Mr. Amer attended in Rhode Island on February 21, 2012, he learned of the better level of service obtained by other Astonish customers, particularly with respect to email marketing. Amer Dep. at 23; DSUF ¶ 82. He expressed his dissatisfaction and asked to have the assigned Raving Fan Manager removed from Amer's account. Amer Dep. at 26. By March 8, 2012 (within two weeks of Mr. Amer's complaint), she had been removed, a new Raving Fan Manager was on board and there were improvements. DSUF ¶ 114. By the end of March, Astonish had fired the former Raving Fan Manager. DSUF ¶¶ 83-84; Schweizer Dep. at 16. By March 22, 2012, the new Raving Fan Manager advised Amer that Astonish was prepared to begin an email marketing campaign. Amer Dep. at 87-88. However, Amer had already given up on the relationship. DSUF ¶ 116. Mr. Amer's decision to look for a lawyer to

---

[14] The "Raving Fan Manager" is an Astonish employee assigned to an insurance agency customer to assist with the transition to the Astonish system. This dedicated marketing and project manager is a critical part of the Astonish system according to the Marketing Agreement. ECF No. 17-1 at 8.

[15] In punctilious detail, the parties hotly dispute virtually every fact pertaining to the Amer employee who was tasked with managing Amer's relationship with Astonish, from when and why she was hired, to why she had difficulty with implementation of parts of the Astonish system and why she abruptly resigned. Because I find none of these facts material to these motions, I have not laid them out in this report and recommendation.

sue Astonish was made immediately following his return from the February seminar. DSUF ¶ 107. By May 9, 2012, suit was filed. At the same time, Amer stopped all communications with Astonish and stopped assisting Astonish in its efforts to support Amer's marketing. DSUF ¶ 123; Amer Dep. at 4. Mr. Amer claims he decided to repudiate and sue because of Astonish's failure to get Amer's data loaded onto the VPC, the non-responsiveness of the former Raving Fan Manager, and disappointment with the quality of the early marketing leads generated by the Astonish system. Amer Dep. at 4-6.

**H.** **Purported Cancelation and Litigation**

On June 20, 2012, Amer's litigation counsel sent a letter to Astonish purporting to cancel the Marketing Agreement. Despite counsel's strident argument in connection with these motions that Astonish wrongfully "failed and refused to refund any of [Amer's] monies, and continues to fail and refuse to take down [Amer's] website," ECF No. 55-1 at 6, the letter does not ask for either of these remedies, nor did Amer itself. PSUF ¶ 136; ECF No. 41-13 at 50. To the contrary, both owners of Astonish testified that Amer did <u>not</u> cancel the Marketing Agreement.[16] Amer Dep. at 44; Tennent Dep. at 73-74. From its launch until the present, Amer has continuously used the website Astonish customized for it, which still incorporates the keywords that Astonish researched and placed for it. DSUF ¶ 271; Amer Dep. at 44; <u>see</u> Tennent Dep. at 74. As a result, by February 2013, Amer's search engine ranking had reached the top of a Google search for "commercial insurance Akron Ohio" performed during a deposition taken in this case. DSUF ¶ 272. After the purported cancelation by counsel, Amer continued to receive

---

[16] Mr. Amer's Affidavit authenticates counsel's cancelation letter but does not endorse its contents. Amer Aff. ¶ 22.

insurance leads through the Astonish system.  DSUF ¶ 299;[17] see Tennent Dep. at 83-84.

Amer's revenues have increased somewhat since it signed the Marketing Agreement, although

Mr. Amer attributes that to profit sharing with carriers for good loss ratios and not from new

business attributable to the Marketing Agreement.  DSUF ¶ 290; Amer Dep. at 44.

## II.    LEGAL ANALYSIS

### A.    Summary Judgment Standard of Review

Under Fed. R. Civ. P. 56, summary judgment is appropriate if the pleadings, the

discovery and disclosure materials on file, and any affidavits show that there is "no genuine issue

as to any material fact and that the movant is entitled to judgment as a matter of law."  Taylor v.

Am. Chemistry Council, 576 F.3d 16, 24 (1st Cir. 2009); Commercial Union Ins. Co. v. Pesante,

459 F.3d 34, 37 (1st Cir. 2006) (quoting Fed. R. Civ. P. 56(c)).  A fact is material only if it

possesses the capacity to sway the outcome of the litigation; a dispute is genuine if the evidence

about the fact is such that a reasonable jury could resolve the point in the favor of the non-

moving party.  Estrada v. Rhode Island, 594 F.3d 56, 62 (1st Cir. 2010); Santiago-Ramos v.

Centennial P.R. Wireless Corp., 217 F.3d 46, 52 (1st Cir. 2000) (quoting Sánchez v. Alvarado,

101 F.3d 223, 227 (1st Cir. 1996)).  The non-moving party "must present definite, competent

evidence to rebut the motion."  Torres v. E.I. Dupont De Nemours & Co., 219 F.3d 13, 18 (1st

Cir. 2000) (internal citations omitted).  Summary judgment cannot be defeated by relying on

improbable inferences, conclusory allegations or rank speculation.  PHL Variable Ins. Co. v. P.

Bowie 2008 Irrevocable Trust, 889 F. Supp. 2d 275, 279 (D.R.I. 2012) (quoting Ingram v.

Brink's, Inc., 414 F.3d 222, 228–29 (1st Cir. 2005)).  In ruling on a motion for summary

judgment, the court must examine the record evidence "in the light most favorable to, and

---

[17] Amer purports to dispute this fact but relies only on the cancelation letter and its First Amended Complaint. Neither controverts the asserted fact, which is based on the testimony of one of Amer's owners and its employees. Tennent Dep. at 83-84; Trenta Dep. at 67; Bergeron Dep. at 33-34.

drawing all reasonable inferences in favor of, the nonmoving party." Feliciano de la Cruz v. El
Conquistador Resort & Country Club, 218 F.3d 1, 5 (1st Cir. 2000) (citing Mulero-Rodriguez v.
Ponte, Inc., 98 F.3d 670, 672 (1st Cir. 1996)).

To defeat a motion for summary judgment, the non-moving party must present
affirmative evidence of specific facts demonstrating a genuine issue as to each element on which
he will bear the ultimate burden at trial. See Santiago-Ramos, 217 F.3d at 53 (citing Anderson v.
Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)). The evidence must be in a form that permits the
court to conclude that it will be admissible at trial. See Celotex Corp. v. Catrett, 477 U.S. 317,
323-24 (1986); Redondo Constr. Corp. v. Izquierdo, 746 F.3d 21, 28-29 (1st Cir. 2014).
Conclusory attestations and "gauzy generalities" are insufficient at the summary judgment phase.
Jakobiec v. Merrill Lynch Life Ins. Co., 711 F.3d 217, 225 (1st Cir. 2013); Cadle Co. v. Hayes,
116 F.3d 957, 960, 961 (1st Cir. 1997); Sandonato v. Days Inn Worldwide, Inc., C.A. No. 07-
451S, 2010 WL 8461122, at *6 (D.R.I. July 21, 2010), adopted by 2012 WL 718720 (D.R.I.
Mar. 5, 2012).

When evaluating cross-motions for summary judgment, the standard does not change;
"[courts] view each motion separately and draw all reasonable inferences in favor of the
respective non-moving party." Bonneau v. Plumbers & Pipefitters Local Union 51 Pension Trust
Fund ex rel. Bolton, 736 F.3d 33, 36 (1st Cir. 2013) (quoting Roman Catholic Bishop of
Springfield v. City of Springfield, 724 F.3d 78, 89 (1st Cir. 2013)). Cross-motions "simply
require [the court] to determine whether either of the parties deserves judgment as a matter of
law on facts that are not disputed." T.G. Plastics Trading Co. Inc. v. Toray Plastics (Am.), Inc.,
958 F. Supp. 2d 315, 321 (D.R.I. 2013) (quoting Adria Int'l Grp., Inc. v. Ferre Dev., Inc., 241
F.3d 103, 107 (1st Cir. 2001)). This Court must view each motion separately in the light most

favorable to the non-moving party, draw all reasonable inferences in that party's favor and determine, for each side, whether a judgment may be entered in accordance with the Rule 56 standard. <u>Bienkowski v. Ne. Univ.</u>, 285 F.3d 138, 140 (1st Cir. 2002); <u>Wells Fargo Bank, N.A. v. Wasserman</u>, 893 F. Supp. 2d 310, 315 (D.R.I. 2012).

This case is before this Court pursuant to diversity jurisdiction so that the parties' substantive claims are governed by applicable state law. Pursuant to the choice of laws provision in the Marketing Agreement, the substantive law of Rhode Island applies. <u>See</u> <u>Rosciti v. Ins. Co. of Pa.</u>, 659 F.3d 92, 96 (1st Cir. 2011); <u>Schofield v. French</u>, 36 F. Supp. 2d 481, 489 (D.R.I. 1999); ECF No. 17-1 at 3 ¶ 15. Even if the Agreement is voided as Amer argues it should be, the parties do not dispute that Rhode Island law controls.

### B. **Amer's Self-Serving Affidavit**

Amer plugs a serious hole in the facts developed during discovery – the lack of proof that Amer relied on the array of allegedly fraudulent promises – with a conclusory and self-serving Affidavit signed by Mr. Amer; apart from an even more conclusory interrogatory answer, the Amer Affidavit is the only record evidence establishing that Amer relied to its detriment on most of the allegedly false representations. Completely lacking specific facts, it sweepingly claims that Amer signed the Marketing Agreement in reliance on:

- every statement made by Astonish in the September and October sales presentations;

- every representation discussed in its attorney's Memorandum of Law in support of Amer's motion for summary judgment; and

- eight specific representations about social media, the website, continuing education credits, reaching the top three spots on search engines like Google, "free" pay-per-click, a dedicated Raving Fan Manager, press releases and blogging and a very quick positive "return on investment."

Amer Aff. ¶¶ 8-11.  The Affidavit specifies that each statement or representation was separately material to Amer's decision to sign the Marketing Agreement.  Amer Aff. ¶¶ 9, 10.  It parrots Amer's response to Astonish's interrogatory asking for the facts in support of its claim of reliance on material misrepresentations and omissions, which simply states, "Agency relied on each and every of the misrepresentations and omissions made by Astonish."  ECF No. 58-6 at 7.  The Affidavit is materially inconsistent in many respects with Mr. Amer's sworn deposition testimony, but makes no attempt to explain the reason for the changed testimony.  A threshold issue for consideration is what weight to afford this troubling Affidavit at summary judgment.

First Circuit precedent states that, "[w]hen an interested witness has given clear answers to unambiguous questions, he cannot create a conflict and resist summary judgment with an affidavit that is clearly contradictory, but does not give a satisfactory explanation of why the testimony is changed."  Colantuoni v. Alfred Calcagni & Sons, Inc., 44 F.3d 1, 4–5 (1st Cir. 1994).  Pursuant to this guidance, called the "sham affidavit" doctrine, the district court need not specifically enumerate each contradiction between the witness' prior testimony and the later-filed affidavit in order to disregard the evidence.  Malave-Torres v. Cusido, 919 F. Supp. 2d 198, 203 (D.P.R. 2013).  Such testimony can be stricken by the court when the party proffering the evidence provides no satisfactory explanation for the changed testimony.  See Torres, 219 F.3d at 20-21 (citing Colantuoni, 44 F.3d at 4-5); Malave-Torres, 919 F. Supp. 2d at 203.  This doctrine bars reliance on portions of an affidavit that are contradicted by the affiant's prior deposition testimony.  See Nelson v. City of Davis, 571 F.3d 924, 928 (9th Cir. 2009) (sham affidavit rule does not necessarily apply when contradictory testimony comes from another witness); Malave-Torres, 919 F. Supp. 2d at 206-07 (striking portions of conclusory affidavit contradicted by sworn testimony, but not portions contradicted by unsworn evidence); Bonilla v.

Electrolizing, Inc., 607 F. Supp. 2d 307, 312 n.3 (D.R.I. 2009) (court declines to invoke sham affidavit rule when inconsistency is not based on affiant's deposition testimony).

It is equally well settled that a conclusory affidavit is insufficient at the summary judgment phase. Posadas de P.R., Inc. v. Radin, 856 F.2d 399, 402 (1st Cir. 1988). Rather, an affidavit must be factually specific to give rise to a genuine issue of material fact. Fleet Nat'l Bank v. H&D Entm't, Inc., 96 F.3d 532, 540 (1st Cir. 1996) (affidavit with only conclusory assertions, lacking dates, names or actual statements, essentially a lawyer-like argument, disregarded at summary judgment). Thus, a claim of fraud in the inducement by a sophisticated business seeking to avoid a contract may be resolved by summary judgment against the claimant when it is based solely on conclusory attestations inconsistent with the written agreement. See HSBC Realty Credit Corp. (USA) v. O'Neill, 745 F.3d 564, 576 (1st Cir. 2014); Curry v. Steve's Franchise Co., Inc., CIV. A. 84-1363-MA, 1984 WL 1468, at *4 (D. Mass. Nov. 21, 1984).

The averment that Amer relied on every statement made in the Astonish sales presentations and that each statement individually induced Mr. Amer to sign (Amer Aff. ¶¶ 8-9) is exactly the sort of improbable and conclusory drivel that is routinely disregarded at the summary judgment phase. See H&D Entm't, Inc., 96 F.3d at 540; Giusti Negron v. Scotiabank De P.R., 260 F. Supp. 2d 403, 409, 411-12 (D.P.R. 2003). Even worse is the averment that:

> [Mr. Amer] read the entirety of the Motion to which this Affidavit is attached, and if any single one of the representations of Astonish discussed in said Motion had not been made by Astonish prior to my execution of the Marketing Agreement, I would not have signed the Marketing Agreement and [the] Agency would not have paid the purchase price to Astonish.

Amer Aff. ¶ 10. Both should be disregarded. H&D Entm't, Inc., 96 F.3d at 540 (citing Wynne v. Tufts Univ. Sch. of Med., 932 F.2d 19, 27-28 (1st Cir. 1991)).

The remaining averments refer to promises on which Mr. Amer claims to have relied (Amer Aff. ¶ 11); they must be individually scrutinized in the context of each claim of fraud to examine the extent to which they either are contradicted by Mr. Amer's sworn testimony, or are both conclusory and inconsistent with other undisputed evidence, and therefore should be disregarded. Malave-Torres, 919 F. Supp. 2d at 203.

## C.     Amer's Claims that Marketing Agreement is Void, Voidable or Canceled

Amer relies on a host of reasons why the Marketing Agreement should be rescinded; they seem to boil down to six. Its blockbuster argument is fraud in the inducement. It also contends that the Marketing Agreement is an unconscionable contract of adhesion; that it was cancelable at will and was canceled; and that it is void due to mistake, because it is vague, ambiguous and indefinite, and because there was no meeting of the minds. These arguments affect Counts[18] VI through IX of the First Amended Complaint. Next, I proceed through each, beginning with fraud in the inducement.

### 1.     Fraud in the Inducement and Misrepresentation

Pegging its hopes on the hoary aphorism that "fraus omnia corrumpit," see LaFazia v. Howe, 575 A.2d 182, 185 (R.I. 1990) ("fraud vitiates all contracts"), Amer asks this Court to rescind the Marketing Agreement because it was "duped" by Astonish into signing it.[19] ECF No.

---

[18] Amer's First Amended Complaint uses an unconventional method for numbering the Counts (called "Causes of Action" in the pleading) that lay out the claims. They follow, and are numbered sequentially, after preliminary sections laying out the names of the parties, the basis for jurisdiction, and the operative facts – exacerbating the confusion, there is no section labeled "IV." In this report and recommendation, I refer to them as "Counts," using the Roman numerals that label them in the First Amended Complaint. For example, the first Count is labelled in the First Amended Complaint as "V" – I use the designation "Count V" to refer to it.

[19] In passing, Amer's brief mentions that it seeks rescission not just for intentional misrepresentation, but also for innocent misrepresentation. In Rhode Island, innocent misrepresentation is actionable only on a showing that the subject matter of the misrepresentation is clearly material to the agreement. Halpert v. Rosenthal, 267 A.2d 730, 733-34 (R.I. 1970). Further, rescission is not available for innocent misrepresentation once the parties have commenced performance and the parties cannot be restored to the status they occupied prior to the contract. Banco Totta e Acores v. Fleet Nat'l Bank, 768 F. Supp. 943, 948 (D.R.I. 1991). Here, there is extensive evidence of

55-1 at 5.  Analysis of Amer's fraud-in-the-inducement claims requires this Court to sift the shifting sands that comprise Amer's array of alleged misrepresentations to determine, as to each, whether there is competent evidence that it amounts to an intentional misrepresentation and that Amer justifiably relied to its detriment.  Cutting through Amer's unhelpful hyperbole, I find the mélange insufficient as a matter of law – the undisputed evidence establishes as to each claimed falsehood that (a) the claimed representation was not made; (b) the claimed representation was actually true; or (c) Amer has failed to present competent evidence that it justifiably relied on the claimed representation.  This part of the journey begins with a hike through the law of fraud.

In Rhode Island, if a contract is reached through fraud and trickery, the duped party who has been intentionally induced to rely on the false representation may sue for damages in an action for deceit or may rescind the contract and recover what was paid.  Zaino v. Zaino, 818 A.2d 630, 637-38 (R.I. 2003).  To establish a *prima facie* case of common law fraud, "the plaintiff must prove that the defendant 'made a false representation intending thereby to induce plaintiff to rely thereon,' and that the plaintiff justifiably relied thereon to his or her damage." Women's Dev. Corp. v. City of Central Falls, 764 A.2d 151, 160 (R.I. 2001) (quoting Travers v. Spidell, 682 A.2d 471, 472-73 (R.I. 1996)).  Liability for fraud cannot attach unless the misrepresentation was intentionally made with intent to deceive.  Fleet Nat'l Bank v. Anchor Media Television, Inc., 45 F.3d 546, 554-55 (1st Cir. 1995) (listing cases).  If the protesting party's complaints are merely a *post-hoc* rationalization to support the decision to repudiate the

---

substantial performance by both parties, particularly by Astonish, which continues to support Amer's website. Further, Amer has not proffered facts to establish that the subject matter of any misrepresentation is sufficiently material as to permit a claim based on innocent misrepresentation.  Accordingly, to the extent that Amer seeks rescission or damages based on innocent misrepresentation, I recommend that summary judgment be granted in favor of Astonish.  See DiMarco-Zappa v. Cabanillas, 238 F.3d 25, 34 (1st Cir. 2001) (simply noting argument in passing insufficient to avoid waiver).

agreement and to renege on a promise to pay for services already rendered, the fraud claim fails. See Parker v. Byrne, 996 A.2d 627, 634 (R.I. 2010).

Summary judgment in favor of a party accused of making a misrepresentation is appropriate to the extent that the statements are not demonstrably false when made. Cruz v. DaimlerChrysler Motors Corp., 66 A.3d 446, 453 (R.I. 2013); see Takian v. Rafaelian, 53 A.3d 964, 973 (R.I. 2012) (affirming grant of summary judgment when defendants point to no specific representations made by plaintiff that resulted in concrete injury). Fraud sufficient to render a contract voidable must be grounded on an untrue statement of a fact and not the offering of an opinion, estimate or prediction of a future event. St. Paul Fire & Marine v. Russo Bros., Inc., 641 A.2d 1297, 1299 n.2 (R.I. 1994); Stanley Weiss Assocs., LLC v. Energy Mgmt. Inc., No. 02-1794, 2004 WL 877540, at *5 (R.I. Super. Ct. Apr. 7, 2004). An assertion limited to future events may result in liability for breach of contract, but it cannot form the foundation for rescission based on fraud or intentional misrepresentation. See Liberty Leather Corp. v. Callum, 653 F.2d 694, 698 (1st Cir. 1981) (predictions as to future acts cannot sustain action for fraud because truth cannot literally be known and because reliance on predictions is unreasonable); Stanley Weiss Assocs., 2004 WL 877540, at *5 (promise of future act does not sound in fraud). Similarly, a claim of fraud in the inducement cannot rest on mere puffery during a sales presentation. See Scritchfield v. Paolo, 274 F. Supp. 2d 163, 172 (D.R.I. 2003) (rosy statements amount to "puffery" and are not actionable) (citing In re Boston Tech., Inc. Sec. Litig., 8 F. Supp. 2d 43, 54 (D. Mass. 1998)).

Justifiable reliance is an essential element of a fraud or intentional misrepresentation claim. See Zaino, 818 A.2d at 638. To prevail, a plaintiff must demonstrate that it was induced to act because of its reasonable reliance upon the alleged false representation. E. Providence

Loan Co. v. Ernest, 236 A.2d 639, 642 (R.I. 1968). "Reasonable reliance is an objective standard and therefore capable of determination on a motion for summary judgment." Stanley Weiss Assocs., 2004 WL 877540, at *4. In determining whether claimed reliance is justifiable or reasonable,[20] the court should consider the sophistication of the party claiming reliance. Id. at *4-5.

Reliance is unreasonable as a matter of law when the supposed misrepresentations are contradicted by, or inconsistent with, the language of the parties' written agreement. HSBC Realty, 745 F.3d at 573 (fraudulent inducement claim undone by express contract terms irreconcilably at odds with alleged contract-inducing misrepresentations); Banco Totta e Acores v. Fleet Nat'l Bank, 768 F. Supp. 943, 948-49 (D.R.I. 1991) (when agreement recites that party based its decision "solely upon its own independent evaluation," it cannot now claim that it was relying on other party's oral statements); Manchester v. Pereira, 926 A.2d 1005, 1012 (R.I. 2007) (claim that defendant made false statement about legal effect of deed fails because inconsistent with writing). Thus, when the agreement has an unambiguous integration clause, with disclaimer language abjuring oral promises, and the written agreement also directly addresses the very matter concerning which plaintiff claims he was defrauded, a claim for fraud cannot be sustained. Sandonato, 2010 WL 8461122, at *6; LaFazia, 575 A.2d at 185. Here, the Marketing Agreement that Mr. Amer signed has a clear integration clause:

> This Agreement, together with the Project Proposal, contains the entire agreement and understanding between [Amer] and Astonish relating to the Equipment and/or Software License and the subject matter hereof, and supersedes any other agreement or understanding, whether written or oral, relating thereto.

---

[20] Rhode Island cases use these terms interchangeably – it is plain that their meaning is the same. See Nisenzon v. Sadowski, 689 A.2d 1037, 1046 (R.I. 1997) ("fraud consists of a false or misleading statement of material fact . . . upon which the plaintiff justifiably relies to its detriment"); Waterman v. Anthony, C.A.70-60, 1979 WL 200292, at *3 (R.I. Super. Ct. June 12, 1979) ("the plaintiff must show that he relied reasonably upon the defendant's statements").

ECF No. 17-1 at 3 ¶ 10.  With such a clause, Amer's claim of reliance cannot be justified as a matter of law as to any claimed falsehood the subject of which is addressed by the Marketing Agreement.  E. Greenwich Fire Dist. ex rel. Zaino v. Henrikson, 632 A.2d 641, 641-42 (R.I. 1993); LaFazia, 575 A.2d at 185.

I take a short detour to consider the legal effect on Amer's fraud claims of Mr. Amer's assertion that he did not read the Agreement, did not review it with counsel and cannot recall whether he had the critical Project Proposal when he signed it.  It is well settled that "a party who signs an instrument manifests his assent to it and cannot later complain that he did not read the instrument or that he did not understand its contents."  Manchester, 926 A.2d at 1012; Fleet Nat'l Bank v. 175 Post Rd., LLC, 851 A.2d 267, 275 (R.I. 2004); see Murray v. Cunard S.S. Co., 139 N.E. 226, 228 (N.Y. 1923) (Cardozo, J.) (one "who omits to read takes the risk of the omission").  When a party is sophisticated, as a matter of law, a claim of fraud cannot be built on the claim either that the plaintiff did not read the contract or that there were portions of the contract missing.  Shappy v. Downcity Capital Partners, Ltd., 973 A.2d 40, 46 (R.I. 2009) (law presumes that no reasonable person would have signed document without reading it, nor would reasonable person have signed it with portions missing); see Anchor Media Television, Inc., 45 F.3d at 554-55 (when omitted material is explicitly mentioned in the writing, party is bound by unified agreement).  "Were it otherwise, signed contracts would be little more than scraps of paper, subject to the selective recollection of the parties in interest."  D'Antuono v. CCH Computax Sys., Inc., 570 F. Supp. 708, 714 (D.R.I. 1983).  Here, the undisputed facts establish that Mr. Amer is the sophisticated owner and chief executive officer of a successful independent commercial insurance agency – his failure to take the time to read the Marketing Agreement is nobody's fault but his own.  Nash & Powers Ins. Servs., Inc. v. Astonish Results, LLC, No. 2:13-

CV-257, slip op. at 6 (E.D. Tenn. May 16, 2014), <u>transferred to</u>, C.A. No. 14-236M (D.R.I. May 16, 2014) (sophisticated insurance agency cannot avoid contract terms by claiming it did not read it); <u>1-Stop Fin. Serv. Ctrs. of Am., LLC v. Astonish Results, LLC</u>, CA-961-SS, 2014 WL 279669, at *7 (W.D. Tex. Jan. 23, 2014) (same).

Against this legal backdrop, I address seriatim Amer's list of false representations and materially misleading omissions, each of which Amer claims is legally sufficient to void the Marketing Agreement. This is not a simple task. Amer's First Amended Complaint lists fifteen representations and four omissions of material fact as the foundation for Count VI (Fraud in the Inducement) and Count IX (Action for Rescission). My focus will be on those that are developed in Amer's motion and those that are itemized in the Affidavit of Mr. Amer.[21] By contrast with the First Amended Complaint and the Affidavit, when asked in his deposition to name every false claim made during the October sales presentation, Mr. Amer listed only "email lists and marketing campaigns, the social media, and the design of our website, how it was going to be different." Amer Dep. at 21, 27.

### i.    Fraud in Inducement – Misrepresentations related to Website

Amer claims that it was falsely told that the website Astonish would design for it would be completely unique and would not have any features identical to websites designed by

---

[21] I do not discuss the representations and omissions labelled as fraudulent in the First Amended Complaint, but no developed in Amer's motion. For example, Amer alleged that Astonish committed fraud by failing to disclose that its sales employees are partially compensated by commission – this claim disappeared after Amer admitted that its own "producers" are also paid by commissions. Amer Dep. at 81. Amer claimed that Astonish promised Amer it would "own" the Astonish software, rather than have a license as is clearly set out in the Marketing Agreement. That claim of fraud seems to have been dropped. Amer's motion also abandons the claim that Astonish intentionally failed to disclose that its approach to return on investment was not based on GAAP and the claim that Astonish's employees were overworked, so its promises could never be delivered. Finally, Amer provides no amplification of the claim that Astonish falsely promised that the Astonish system would reduce costs or the number of employees Amer would need. With no evidence purporting to establish the elements of fraud or intentional misrepresentation as to these claims, I find that Amer has waived them and recommend that this Court grant summary judgment in favor of Astonish on Counts VI and IX as to each. <u>See</u> <u>Arneson v. Grebien</u>, CA 11-190-ML, 2013 WL 2250763, at *2 (D.R.I. May 22, 2013) ("In the absence of a developed argument by the plaintiffs . . . the Court deemed that issue waived.").

Astonish for other insurance agencies. Relatedly, Amer claims that it had no idea that Astonish uses a single software platform from which it develops customized websites for its customers, so that they share a similar look and feel. It also claims that it had no idea either that Astonish does business with hundreds of insurance agencies across the country or with insurance agencies in Ohio. It contends that it was induced to sign the Marketing Agreement by the false promise of a completely unique website and by the intentional failure to disclose that Astonish designs websites with overlapping features and a similar look and feel for hundreds of independent insurance agencies across the country, some of which are in Ohio and therefore may compete with Amer.[22]

Amer's claim of reliance on website-based fraud is set out in conclusory averments in the Amer Affidavit, one of which is squarely inconsistent with Mr. Amer's sworn testimony. Compare Amer Aff ¶ 5 ("I had no idea Astonish had published websites . . . for other agencies on [sic] Ohio"), with Amer Dep. at 12 (before entering agreement with Astonish, Mr. Amer looked at website for a customer of Astonish in Ohio). The rest are directly contradicted by the Marketing Agreement, which describes the website as "customized," built on a "Content Management System," and which touts that Astonish has provided websites to "hundreds of insurance agencies across the country." ECF No. 17-1 at 6; see also ECF No. 58-15 at 4 (September sales presenter states, "[w]e have at this point probably about 500 agencies that use us"). The Marketing Agreement does not promise a "unique" website, as the Amer Affidavit claims.

There was and is no secret as to the extent to which Astonish-designed websites have a similar look and feel. It would be folly for Astonish to try to deceive potential customers – every

---

[22] Among other remedies, Amer contends that this fraud should result in an order that Astonish is barred from doing business with any entity that might compete with Amer.

Astonish-powered website is publicly available to anyone with a computer who cares to take a look. Mr. Amer's decision to contact Astonish was based on Astonish-built sites he saw on the internet. DSUF ¶¶ 20-23. As a result of his due diligence before he signed the Marketing Agreement, he learned "what the websites looked like" by examining the websites of Astonish customers. Amer Dep. at 12-15. Based on this testimony, Mr. Amer's inconsistent averment in his Affidavit that he was promised a totally unique website, with no feature identical to what he saw during his due diligence (Amer Aff. ¶¶ 4, 11(ii)), must be disregarded pursuant to the sham affidavit doctrine. Torres, 219 F.3d at 20-22 (citing Colantuoni, 44 F.3d at 4-5); Malave-Torres, 919 F. Supp. 2d at 203. Further, even if these averments are considered, as a matter of law, Amer's conclusory claims of reliance on these representations are not justifiable because the Marketing Agreement has an unambiguous integration clause and is inconsistent with the claimed falsehoods. HSBC Realty, 745 F.3d at 576; Stanley Weiss Assocs., 2004 WL 877540, at *5. Finally, these claims fail the common sense test. Amer was drawn to Astonish by looking at the websites it built for other customers; it is illogical for it to claim now that it was falsely promised something completely different. See HSBC Realty, 745 F.3d at 573-74; Stanley Weiss Assocs., 2004 WL 877540, at *4-5.

I recommend that summary judgment be granted in favor of Astonish and against Amer as to all claims based on fraud and intentional misrepresentation in connection with the website, the number of insurance agencies Astonish does business with and the fact that Astonish does business with Ohio agencies.

### ii.       Fraud in Inducement – Social Media and Blogging

The trek pushes on to the claim in Mr. Amer's Affidavit that Amer relied to its detriment on the false promise that Astonish would do 100% of the work required to post on social media,

to blog and to issue press releases, so that the Marketing Agreement would allow Amer employees to do nothing.  Amer Aff. ¶ 11(i, vii).  Consistently, Mr. Amer testified that Mr. Buckley promised, "they would take care of it all, post things, blog, we didn't have to . . . do anything."  Amer Dep. at 22.  By contrast, Astonish agrees that it was prepared to do some posting, blogging and press release issuance for Amer, but Mr. Buckley testified that Astonish believed it would be far more effective for the agency to learn to do it itself, particularly where these public statements reflect the agency's business.  Buckley Dep. at 49, 115-16.  In addition, as promised by the Marketing Agreement, Astonish had calibrated its approach to social media to respond to changes on the internet that had made third-party blogging less effective.  DSUF ¶¶ 189-91; PSUF ¶¶ 66-67.

Two undisputed facts are fatal to Amer's claim of fraud in the inducement based on this alleged false promise.  First, Mr. Amer's co-owner, Mr. Tennent heard the same sales presentations and testified to his impression that Astonish promised to do everything, but also testified that he did not believe any of it.  Tennent Dep. at 37.  Second, the Marketing Agreement is explicit that, with respect to social media, Astonish helps, but Amer's employees do the work:

> Astonish will help you create accounts on most of the popular social media platforms. We can provide innovative strategies to coach you on executing an effective social media campaign. . . . You MUST use social media and blog frequently.  If you can't do it yourself, hire someone who can . . . .

ECF No. 17-1, at 9, 13 (emphasis supplied).  The dispute that emerges from the evidence is that Astonish did post on Facebook and other social media, did blog and did prepare at least one press release for Amer, but Amer was thoroughly dissatisfied with the quality and quantity, as well as with the support it received.  DSUF ¶¶ 111, 201-02, 204-06; PSUF ¶ 73; Bedell Dep. at 155, 161. In the face of undisputed evidence establishing that the Marketing Agreement directly contradicts the claimed false promise, that Amer's co-owner did not believe the claimed false

promise, and that the parties' real dispute is over the quality of Astonish's social media support, Amer's claim of justifiable reliance on a false promise fails. While Amer may have a claim for breach of contract arising from inadequate support for its social media and blogging, it cannot avoid the contract by claiming fraud in the inducement. I recommend that Astonish's motion for summary judgment on this claim be granted and that Amer's corresponding claim be denied.

### iii. Fraud in Inducement – Pay-Per-Click at no Extra Charge

Amer alleges fraud in the inducement based on the claim that Mr. Buckley falsely promised that Amer's pay-per-click would be entirely paid for by Astonish to induce Amer's reliance in deciding to sign the Marketing Agreement. The only evidence of this promise and Amer's reliance on it is Mr. Amer's Affidavit. Amer Aff. ¶¶ 11(v), 13. While the facts reveal ambiguity in the Marketing Agreement's language about who pays for pay-per-click and may support a claim for breach of contract, they are insufficient to establish contract-inducing fraud.

The evidence of this alleged false promise may be briefly reviewed. Inconsistent with his Affidavit averment on pay-per-click, Mr. Amer testified that Amer paid Astonish a $10,000 advance to get started with pay-per-click advertising on Google; he did not mention pay-per-click when asked to list all the things said by Mr. Buckley that he now believes to be false. Amer Dep. at 19, 21, 27. Only Mr. Tennent testified to his belief that pay-per-click had to be part of the "cost, because we were buying a total package," but conceded he did not recall whether Mr. Buckley actually said that and he was not present when Mr. Amer talked to Mr. Buckley about pricing for the system. Tennent Dep. at 45-48. By contrast, Mr. Buckley testified that Astonish agreed to provide Amer with free pay-per-click for the first ninety days of the Marketing Agreement; consistently, the September sales transcript reflects that the presenter stated that Amer would get some pay-per-click covered by the up-front price, but also was clear

that "the only areas [Amer] get[s] more cost in is if you want to do more pay-per-click." However, the September presenter did not mention the length of time for "free" pay-per-click. Buckley Dep. 97-98; ECF No. 58-16 at 61; <u>see also</u> Schweizer Dep. at 19 (new customers pre-paid for some pay-per-click; customers had to purchase more pay-per-click).

The Marketing Agreement is ambiguous with respect to whether pay-per-click is partially (as Mr. Buckley and the September sales presentation stated) or entirely (as Mr. Tennent understood) covered by the basic contract price; if partially covered, the Agreement is silent on the length of the period of time. Based on this ambiguity, in its breach of contract claim, Amer may introduce parol evidence to establish who pays for pay-per-click. ECF No. 17-1 at 8, 12. If a fact finder accepts Mr. Tennent's version, Astonish may well be contractually obliged to subsidize Amer's pay-per-click not just for ninety days but for the life of the Marketing Agreement; put differently, if Amer proves that Mr. Buckley promised free pay-per-click, the promise is not false because Astonish would be bound. In this factual mix, there is no evidence of intent to make a false statement to induce reliance and no evidence that whatever Mr. Buckley said was false.

Free pay-per-click also fails as fraud because of the lack of competent evidence that Amer justifiably relied. Apart from Mr. Amer's conclusory Affidavit averment, there is no evidence that pay-per-click at no additional charge was important to Amer, never mind that it was the contract-inducer that caused it to sign the Marketing Agreement. To the contrary, the undisputed evidence establishes that Amer never asked for support with pay-per-click advertising, was never billed for pay-per-click advertising and never did any pay-per-click advertising. Amer Dep. at 72; DSUF ¶¶ 309, 312. With no evidence suggesting that Amer ever asked Astonish to arrange for pay-per-click advertising, even during the ninety-day period when

both parties agree that it was "free," or that Astonish ever asked Amer to pay for pay-per-click advertising done on Amer's behalf, the conclusory averment of reliance in the Amer Affidavit is insufficient so that this allegation fails as a foundation for a claim of fraud in the inducement. E. Providence Loan Co., 236 A.2d at 642 (plaintiff must present competent evidence that it was induced to act by false representation).

### iv.    Fraud in Inducement – Guaranteed Top Three Position on Google Search

Unlike pay-per-click, and most of the other alleged contract-inducing representations, the record establishes that a strategy to push Amer higher in the Google search rankings for non-paid results of searches using keywords was important to Amer. Amer claimed that Astonish promised to use its best efforts to improve Amer's search engine rankings. Mr. Amer testified that Mr. Buckley said that Astonish would "give us everything we needed to give us front page SEO rankings." Amer Dep. 20. Mr. Tennent testified that Mr. Buckley "mentioned that he would have us in the top three slots on a search . . . ." Tennent Dep. at 40. In Mr. Amer's Affidavit, this morphs into a contract-inducing guarantee that Amer will hit the "top 3 spots." Amer Aff. ¶ 11(iv). And Astonish does not materially disagree: the Marketing Agreement promises that Astonish "has a comprehensive blended strategy for helping [Amer] obtain great SEO placements and rankings that are meaningful and lasting." ECF No. 17-1 at 8.

This claim stumbles on Amer's undisputed success in improving its Google ranking as established by the undisputed evidence – by April 2012, Amer had one search term ranked in the top three and its ranking continued to improve, culminating in a demonstration that Amer had hit the top spot for the terms "commercial insurance Akron Ohio" at a deposition taken in this case in February 2013, a year and a half into the Marketing Agreement. See DSUF ¶¶ 267-70, 272; Duquette Dep. at 187-88. In short, whatever Amer was promised, it got what it says it was

supposed to get with respect to Google. At most, it could complain that Astonish's search engine efforts did not achieve the same results on Bing. This is not fraud. I recommend that this Court reject Amer's claim of fraud in the inducement based on reliance on a false statement that it was guaranteed search engine ranking in "the top 3 spots."

### v. Fraud in Inducement – Email Marketing

Amer's inclusion of email marketing as a service falsely promised to buttress Amer's claim of fraud in the inducement does not make sense. Mr. Amer testified about his understanding that Astonish would assist Amer in purchasing email lists and design a multi-stage email marketing campaign targeted to a specific niche of business, though his Affidavit does not list that as a misrepresentation that induced Amer to enter the Marketing Agreement. Compare Amer Dep. at 21, 27, with Amer Aff. ¶ 11. And Astonish agrees that it promised this service; the disputed facts pertain only to the quality of its performance.

The Raving Fan Manager's inability to deliver on this promise to Amer's satisfaction was a principal reason for Amer's complaint about her; she was replaced as a result. The new Raving Fan Manager immediately started working on an email marketing campaign and matters improved, DSUF ¶ 114, but Amer had already given up on the relationship. See DSUF ¶ 123. Mr. Amer's dissatisfaction with email marketing was a principal reason. Amer Dep. at 24. Before the music stopped, Astonish had conducted an automated general email campaign for holidays and birthdays, Bedell Dep. at 69, and successfully launched several targeted email campaigns, although there were a number of issues. Bedell Dep. at 54, 65-68.[23]

This is not fraud, but breach of contract. To the extent that Amer's claim for rescission is based on an alleged false promise of email marketing, I recommend that this Court grant

---

[23] The parties each refer to this testimony; Astonish focusing on the success of the email campaigns, while Amer emphasizes the problems. Compare DSUF ¶¶ 157-58, 165-66, 168, with PSUF ¶ 110.

summary judgment against Amer and in favor of Astonish because the promise was not false; only the execution of the promise is at issue.

### vi.     Fraud in Inducement – "Quick" Return on Investment

Mr. Amer's Affidavit avers that he relied on Mr. Buckley's false promise that Amer would "very quickly" earn a positive return on its investment in the Marketing Agreement. Amer Aff. ¶ 6. By contrast, Mr. Amer's testimony omits that he was ever told that a positive return would be a guarantee or "very quick;" rather, he testified that he believed that Amer would start to see a return on its investment with Astonish "within the first year." Amer Dep. at 38. Other evidence establishes that Astonish provided Amer with information about the success of some of its other customers, told Amer that it should monitor its return on the money invested in the Astonish contract, and provided it with a work sheet to do so; Mr. Buckley claims he told Amer that it could experience success over time if it used all of the components of the Astonish system but made no promises about how much or when. ECF Nos. 58-15 at 21-22; 58-16 at 55; Buckley Dep. at 130, 206; Amer Dep. at 38-39. The transcript of the September Sales presentation is consistent with Mr. Buckley's claim that he made no promises. See ECF No. 58-16 at 32-33.

There is no suggestion that any of the success stories described during the sales presentations were false.[24] See State v. Letts, 986 A.2d 1006, 1012 (R.I. 2010) (plaintiff has burden to produce sufficient evidence for reasonable inference that a false statement was made with intent to defraud); Cambrola v. Kaiser Aluminum & Chem. Corp., 416 A.2d 694, 697 (R.I.

---

[24] As discussed *infra*, Amer presents the testimony of two disgruntled former Astonish employees, both of whom claim to hold the opinion that Astonish is a scam. One of the two stated that she believed the projected results used in sales presentations overstated what an average insurance agency was likely to produce because they were based on successful agencies, but also conceded that the data was not false – "I'm not saying that there was never a client that produced those numbers." Duquette Dep. at 29.

1980) (same).  Moreover, the claim that Astonish promised quick results is contradicted by the Marketing Agreement, which repeatedly emphasizes the time it will take to see positive results. ECF No. 17-1 at 12 ("changing your culture and business model does NOT happen overnight;" three-year "Crawl, Walk, Run" timeline is to manage expectations).

At bottom, this claim fails because this is the sort of puffery or prediction of future business performance that cannot be the foundation for a claim of fraud in the inducement.  See Liberty Leather Corp., 653 F.2d at 698 (predictions as to future acts cannot sustain action for fraud); Scritchfield, 274 F. Supp. 2d at 172 (rosy statements about future performance amounts to "puffery" and is not actionable); see also Kennesaw Life & Accident Ins. Co. v. Flanigan, 151 S.E.2d 881, 881 (Ga. Ct. App. 1966) (inaccurate representation of guaranteed rate of return fails to state claim).  In addition, there is simply no evidence of reasonable reliance on a promise of a "quick" return on investment, beyond Mr. Amer's conclusory Affidavit, which is contradicted by his own testimony, the Marketing Agreement and the testimony of Amer's other owner, Mr. Tennent, who recalled that Mr. Buckley "promised us a very favorable rate of return on our investment" but "felt that what [Mr. Buckley] promised would never be delivered."  Tennent Dep. at 31, 33.

I recommend that summary judgment be entered in favor of Astonish and against Amer on the claim that Amer was fraudulently induced to sign the Marketing Agreement by a false guarantee of a quick positive return on investment.

> ### vii.    Fraud in Inducement – Software Updates at No Additional Expense

This claim of fraud appears in Amer's First Amended Complaint and is mentioned in its briefing on these motions.  See ECF No. 17 ¶ 7(d); ECF No. 55-1 at 14.  It is difficult to understand what Amer is complaining about.  The Marketing Agreement clearly promises that

Amer will get the benefit of software updates as they are developed, and there is no evidence that it did not. See DSUF ¶¶ 238-40 (Astonish upgrade provided at no additional charge).

### viii.    Fraud in Inducement – Turn-Key System

Amer's claim that Astonish fraudulently promised a "turn-key" system is based on a phrase that popped out of the mouth of Astonish's disgruntled former employee during her deposition. Schweizer Dep. at 51, 52 (impression that customers thought Astonish was "almost a turnkey type of thing" based on her initial calls with them). Amer adopted her phrase in its legal Memorandum of Law, arguing that it is an element of its fraud claim. ECF No. 55-1 at 14. The only evidence of reliance on this supposed promise is Mr. Amer's Affidavit's conclusory paragraph, which asserts that Amer relied on whatever its attorney argued in the Memorandum. Amer Aff. ¶ 10. Mr. Amer never mentioned this phrase in his deposition; the closest match is Mr. Tennent's testimony that Mr. Buckley said that "Astonish was going to do everything . . . . We sat back and he was going to run these marketing and sales campaigns and revenue was going to flow in the door." Tennent Dep. at 37. The fly in the ointment is Mr. Tennent's skepticism: "I did not [believe him.]" Id. This is fatal to a fraud claim grounded on this alleged false statement. In the absence of any evidence either of the false promise or of justifiable reliance on it, this claim must fail.

### ix.    Fraud in Inducement – Continuing Education Credits for Agency Producers

In conclusory language, Mr. Amer's Affidavit lists a promise that Astonish would provide continuing education credits for agents as a misrepresentation that induced him to sign the Marketing Agreement. Amer Aff. ¶ 11(iii); see also PSUF ¶¶ 6-7. This claim is missing from the First Amended Complaint and there is no factual proffer by either party that Amer ever wanted Astonish to assist with continuing education credits for agents or cared whether

continuing education courses were provided. Further, during the September sales presentation, the Astonish representative said it provides continuing education credits and there is no evidence that Astonish did not offer continuing education just as its representative stated. See ECF No. 58-15 at 3. It seems a concocted complaint; in fact, one Amer employee testified she took a continuing education class through Astonish and received an ethics credit. Bergeron Dep. at 29. Amer has failed to produce a scintilla of competent evidence to establish either that this promise was false or that it induced Amer to sign the Marketing Agreement.

### x. Fraud in Inducement – Dedicated Raving Fan Manager

Mr. Amer's Affidavit lists the provision of a dedicated and responsive Raving Fan Manager as a promise on which Amer relied in signing the Marketing Agreement. Amer Aff. ¶ 11(vi). This promise plainly was not a false representation made with intent to deceive – Astonish provided a Raving Fan Manager and when Amer complained that she was not up to snuff, Astonish promptly replaced her. While Astonish's execution of this promise may support a breach of contract claim, the promise itself cannot support a claim of fraud in the inducement.

### xi. Fraud in Inducement – Lay Opinion Evidence that Astonish is "Fraud" and a "Scam."

Amer's fraud in the inducement argument places considerable weight on the testimony of two disgruntled former Astonish employees, one of whom, Ms. Schweizer, was the incompetent Raving Fan Manager who was fired after Amer complained about her poor job performance, while the other, Ms. Duquette was a sales and finance employee who was also fired. See Schweizer Dep. at 13-14, 16; Duquette Dep. at 13. Both testified to extravagant "opinions" that Astonish is a fraud, a scam, unethical and immoral, and that its sales practices are fraudulent, blatant lies intended to mislead. PSUF ¶¶ 140-83.

This lay opinion testimony may be considered at the summary judgment phase of the case only to the extent that it would be admissible at trial. Celotex Corp., 477 U.S. at 323-24; Redondo Constr. Corp., 746 F.3d at 28-29. Admissibility is determined by reference to Fed. R. Evid. 701, which provides that a lay witness may offer opinions that are: (a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702. Fed. R. Evid. 701. Under Rule 701, lay witnesses may express opinions about a business "based on the witness's own perceptions and 'knowledge and participation in the day-to-day affairs of [the] business.'" United States v. Polishan, 336 F.3d 234, 242 (3d Cir. 2003) (alternation in original) (quoting Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1175 (3d Cir. 1993)); Williams Enters., Inc. v. Sherman R. Smoot Co., 938 F.2d 230, 233-34 (D.C. Cir. 1991) (allowing an insurance broker who had personal knowledge of an insured's business to offer lay opinion testimony on cause of increase in insured's premiums); see also Neponset Landing Corp. v. Nw. Mut. Life Ins. Co., 902 F. Supp. 2d 166, 172 (D. Mass. 2012). The admissibility of these opinions turns on the degree to which they are "rationally based on the witness's perception." Fed. R. Evid. 701(a); United States v. Munoz-Franco, 487 F.3d 25, 35-36 (1st Cir. 2007). In evaluating these opinions, this Court must be mindful that testimony regarding culpability – here fraud – is a form of lay opinion that will rarely, if ever, meet the requirements of the Rule. See United States v. Rodriguez-Adorno, 695 F.3d 32, 38-39 (1st Cir. 2012); United States v. Vázquez–Rivera, 665 F.3d 351, 358 (1st Cir. 2011); see Alexis v. McDonald's Rests. of Mass., Inc., 67 F.3d 341, 347 (1st Cir. 1995) (as depositions disclosed no evidentiary foundation for opinion of racial animus, conclusory lay opinions were properly excluded).

Neither Ms. Schweizer nor Ms. Duquette had any knowledge of what was said to Amer during either of the sales presentations. Schweizer Dep. at 248-51; Duquette Dep. at 38. Ms. Duquette never heard Mr. Buckley say anything misleading in any sales presentation. Duquette Dep. at 38. When pressed to explain the foundation of her accusations that Mr. Buckley and another Astonish salesman lied and knew they were lying, she admitted, "I can't tell. I've never witnessed any of their presentations or their pictures." Duquette Dep. at 38. The only specific "misrepresentation" Ms. Duquette could testify to is irrelevant hearsay (she heard it from another Astonish customer, not Amer) that Mr. Buckley failed to tell customers that a financing application would require tax returns. Duquette Dep. at 37. Similarly, Ms. Schweizer said she never heard any Astonish employee say anything misleading, untrue or deceptive to any prospective customer. Schweizer Dep. at 46. Specifically, she never heard Mr. Buckley say anything untrue, deceptive or misleading. Schweizer Dep. at 126.

Examination of their testimony confirms that the foundation for this opinion testimony is double and triple level hearsay and speculation. See, e.g., Duquette Dep. at 109 (unnamed Astonish employees told her unnamed customers had told them that Mr. Buckley had said something about Astonish's capabilities that was not true); Duquette Dep. at 28-30 (speculates that numbers used in sales presentations regarding success of other Astonish customers are based on very successful, not ordinary, agencies); Duqette Dep. at 45 (speculates that Mr. Buckley was given inaccurate statistics to give to prospective customers); Schweizer Dep. at 46 (belief that sales presentations are false based on impression drawn from talking to customers regarding what salesman might have said). Ms. Schweizer's opinion that Astonish was "unethical" arose from her observation of senior employees drinking until 4:00 a.m. at a sales meeting. Schweizer Dep. at 23-25. Some of their testimony about fraud is directly contradicted by the Marketing

Agreement – for example, Ms. Duquette testified that customers were falsely led to believe the system would work on its own, Duquette Dep. at 35-36, and was not aware that the Marketing Agreement explicitly states "[y]ou MUST use social media and blog frequently. If you can't do it yourself, hire someone who can . . . ." ECF No. 17-1 at 13. Some of their opinion testimony was procured through improperly leading questions. Duquette Dep. at 47-48 ("rip-off"), 58-59 ("fraud"); Schweizer Dep. at 130 ("fraud").

I find that the lay opinion testimony of Ms. Duquette and Ms. Schweizer that Astonish is a fraud, a scam and unethical does not constitute evidence that will be admissible at trial pursuant to Fed. R. Evid. 701. Accordingly, I recommend that this Court disregard it in determining whether there is a sufficient factual showing to permit the claims of fraud in the inducement to survive summary judgment.

### xii.    Fraud in Inducement – Conclusion

Amer's insistence that it was duped by fraud into signing the Marketing Agreement cannot withstand the scrutiny required at the summary judgment phase. Astonish may have used puffery and sales tactics to persuade this sophisticated insurance agency to sign, but that is not fraud. Astonish may not have delivered on all that it promised, but that is not fraud. Accordingly, I recommend that this Court grant summary judgment in favor of Astonish and against Amer on Count VI in its entirety and on Count IX, to the extent that it is based on the claim that the Marketing Agreement was procured by misrepresentations.

### 2.    Unconscionable Adhesion Contract

As an alternative path to avoidance of the Marketing Agreement, Amer contends that the Agreement fits the paradigm of a contract of adhesion so lopsided as to be unconscionable and a violation of public policy; specifically, Count VIII seeks a declaration by this Court that the

Marketing Agreement is a contract of adhesion, unconscionable and violative of public policy, while Count IX asks this Court to rescind the Agreement because it is an unconscionable contract of adhesion.  Because the Marketing Agreement is a contract between two sophisticated businesses and the highly meaningful choice of walking away from Astonish was always available to Amer, as a matter of law, I find that the Agreement is neither a contract of adhesion nor unconscionable and recommend that this Court dispose of these claims in favor of Astonish. See Nash & Powers Ins. Servs., Inc., No. 2:13-CV-257, slip op. at 5-6 (rejecting same argument by same attorney who represents Amer that substantially same Astonish agreement with different insurance agency is contract of adhesion; "[agency's] allegations simply do not support concluding the Agreement was a contract of adhesion" . . . because "[agency] is a sophisticated insurance agency and was in total control over whether to buy Astonish's products and services"); 1-Stop Fin. Serv. Ctrs., 2014 WL 279669, at *7 (same).

Mr. Amer's undisputed sophistication as the well-educated chief executive officer of an insurance agency specializing in commercial insurance that employs twenty-four, with two locations, in business at least thirty-eight years, is fatal to Amer's argument that this is a contract of adhesion.  See DSUF ¶¶ 11-16; HSBC Realty, 745 F.3d at 576-77 (claim based on allegation of unconscionable contract of adhesion undone by defendant's undisputed business sophistication); Acinapura v. Natalizia, PC 1999-2007, 2003 WL 22048717, at *10 (R.I. Super. Ct. July 30, 2003) (Thompson, J.).  In any event, adhesion contracts are only invalid when they are unconscionable, that is, when they are so commercially unreasonable and unfair to the weaker party that a court will refuse to enforce them.  Microfibres, Inc. v. McDevitt-Askew, 20 F. Supp. 2d 316, 324 (D.R.I. 1998); see Kristian v. Comcast Corp., 446 F.3d 25, 42 (1st Cir. 2006) (contracts of adhesion are generally enforceable absent a separate finding that such

contracts are unconscionable). To invalidate a contract on the basis of unconscionability, a party must prove that: (1) there is an absence of "meaningful choice" on the part of one of the parties due to a gross inequality of bargaining power; and (2) the challenged contract terms are "unreasonably favorable" to the other party. E.H. Ashley & Co., Inc. v. Wells Fargo Alarm Servs., 907 F.2d 1274, 1278 (1st Cir. 1990).

Amer tries to satisfy the element of lack of choice with its bitter complaints that Astonish would not negotiate the boilerplate terms of the pre-printed forms that comprise the Marketing Agreement and that Mr. Buckley offered a price good for one day only and then said he had to catch his flight. PSUF ¶¶ 31-33, 39-42. This argument overlooks Amer's obvious option to refuse to sign the Agreement and walk away. Nash & Powers Ins. Servs., Inc., No. 2:13-CV-257, slip op. at 5-6 ("[The plaintiff] could have walked away from the contract, being under no compulsion to deal in Astonish products"); 1-Stop Fin. Serv. Ctrs., 2014 WL 279669, at *7 (no contract of adhesion because "[the agency] could have declined at any point to sign up for Astonish's program"); Fowler v. Cold Stone Creamery, Inc., CA 13-662 S, 2013 WL 6181817, at *2 (D.R.I. Nov. 25, 2013) (obvious second option of walking away defeats that contract unconscionable). With that choice readily available, Amer cannot demonstrate absence of meaningful choice as a matter of law. Fowler, 2013 WL 6181817, at *2; see Awuah v. Coverall N. Am., Inc., 554 F.3d 7, 12 (1st Cir. 2009) ("courts have no general power to relieve parties of bad bargains"); Grady v. Grady, 504 A.2d 444, 445-46 (R.I. 1986) ("That a contract's performance becomes more difficult or expensive than originally anticipated does not justify setting it aside"). Amer "cannot avoid poor business practice and decisionmaking by claiming this was a contract of adhesion." Nash & Powers Ins. Servs., Inc., No. 2:13-CV-257, slip op. at 6; 1-Stop Fin. Serv. Ctrs., 2014 WL 279669, at *7.

Amer's claim also founders on the second element of unconscionability because the terms that Amer labels as conscience-shocking simply do not rise to that level.  See, e.g., Rivera v. Centro Medico de Turabo, Inc., 575 F.3d 10, 18-19 (1st Cir. 2009) (forum selection clause not per se unconscionable) (listing cases); E.H. Ashley & Co., Inc., 907 F.2d at 1279 (clause limiting one party's liability not unconscionable); Microfibres, Inc., 20 F. Supp. 2d at 324 (pressure to sign contract without time to review it does not make contract per se unenforceable); Hart Eng'g Co. v. FMC Corp., 593 F. Supp. 1471, 1479-80 (D.R.I. 1984) (warranty disclaimers not per se unreasonable or unconscionable).  A sophisticated business cannot claim that it did not review a contract adequately and then seek to avoid its terms on grounds that it is a contract of adhesion. Nash & Powers Ins. Servs., Inc., No. 2:13-CV-257, slip op. at 5-6; 1-Stop Fin. Serv. Ctrs., 2014 WL 279669, at *7; see Pride Hyundai, Inc. v. Chrysler Fin. Co., LLC, 263 F. Supp. 2d 374, 398 (D.R.I. 2003) ("courts have generally been chary about using the doctrine of unconscionability to protect merchants and similar professionals, declining to apply the doctrine in favor of sophisticated corporations") (quoting Farnsworth on Contracts § 4.28, at 564 (2d ed. 1998)); see also Acinapura, 2003 WL 22048717, at *10.

The paradigmatic unconscionable contract of adhesion arises when a party with vastly superior bargaining power incorporates language into a contract that is part of an oppressive scheme to deliberately cheat large number of consumers out of individually small sums.  AT&T Mobility LLC v. Concepcion, 131 S. Ct. 1740, 1746 (2011).  The undisputed facts here are not even close.  I recommend that this Court grant summary judgment in favor of Astonish and against Amer on Amer's claim in Count VIII that the Marketing Agreement is voidable as an unconscionable contract of adhesion.[25]

---

[25] Amer's Count VIII also alleges that the Marketing Agreement is unenforceable because it violates public policy and its waiver disclaimers are unenforceable.  During briefing and argument on these motions, these claims were

### 3.     Cancelation of the Marketing Agreement by Amer

In Count VIII of its First Amended Complaint, Amer asks this Court for a declaration that the Marketing Agreement is cancelable at any time and was properly canceled by the letter of Amer's counsel dated June 20, 2012, sent shortly after Amer filed this suit. See ECF No. 41-13 at 50. I begin with a switchback through the facts.

Mr. Amer claims in both his Affidavit and his testimony that Mr. Buckley told him that Amer could cancel at any time. Amer Aff. ¶ 12; Amer Dep. at 18; PSUF ¶ 135. Astonish claims that the Marketing Agreement is non-cancelable for the five-year Initial Term. The viability of Amer's position depends on this Court's interpretation of the seemingly inconsistent language of the Agreement: paragraph 3(e) of the Agreement states that it "shall be non-cancelable for the term set forth below." ECF No. 17-1 at 2 (emphasis supplied). However, the only "term" contained in the Agreement is not set forth below, but rather is the sixty-month "Initial Term" set forth just above this sentence. Id. Below, the reader finds a related provision, which states that notice of termination must be sent at least sixty days in advance of the end of the five-year Initial Term to avoid an automatic one-year renewal. Id. ¶ 4. This Court must determine whether the non-cancelation clause in the Agreement, marred by an obvious mistake, is ambiguous so as to justify the introduction of the parol evidence from Mr. Amer that he was told it was cancelable at will; Amer argues that this obvious scrivener's error would allow a reasonable person to interpret the Agreement as cancelable at will.

---

subsumed by Amer's overarching claim of unconscionability; no separate argument was presented on either. Accordingly I recommend that this Court enter summary judgment against Amer and in favor of Astonish as to each. DiMarco-Zappa, 238 F.3d at 34 (simply noting an argument in passing without explanation is insufficient to avoid waiver); Arneson, 2013 WL 2250763, at *2 ("In the absence of a developed argument by the plaintiffs . . . the Court deemed that issue waived."); Putnam Res. v. Pateman, 757 F. Supp. 157, 166 (D.R.I. 1991) (party's claim fails when it "fire[s] off a volley of arguments without any concern for the accuracy of their trajectory in the hope that one may ultimately strike the target," with "scant assistance" to court).

Reading the Marketing Agreement holistically, I find that this interpretation falls outside of the realm of common sense, particularly when the non-cancelation clause is read in context with the provision that requires payment up front for the entire term, with the clause regarding notice of termination, which is not effective until the end of the Initial Term, and the many provisions that speak to the significance of a multi-year commitment to the Astonish system. See HSBC Realty, 745 F.3d at 574 (contract provision must be read in context of entire agreement with a dose of common sense, rather than in isolation); Sturbridge Home Builders, Inc. v. Downing Seaport, Inc., 890 A.2d 58, 63 (R.I. 2005) (same). I find that, while sloppy, the Marketing Agreement is unambiguously non-cancelable for the Initial Term so that Amer's prayer for a declaration that it may be interpreted as cancelable at will fails as a matter of law.[26]

The final twist in this portion of the trail is the cancelation letter dated June 20, 2012, sent by Amer's counsel after this litigation commenced. This lawyer's letter states simply, "please be advised that Amer does hereby . . . cancel the Marketing Agreement." See ECF No. 41-13 at 50. Neither Astonish nor Amer paid any attention to the letter. From then to the present, Astonish has continued to perform to the extent that it could in light of Amer's refusal to assist and Amer has continued to use the Astonish website, benefit from its improved search engine rankings and follow up on Astonish sales leads. DSUF ¶¶ 271, 298-99.[27] At their depositions, both of Amer's owners denied that Amer had ever canceled the Marketing Agreement. Amer Dep. at 44; Tennent Dep. at 73-74. I find that the cancelation letter is a nullity and should be disregarded.

---

[26] Mr. Amer's Affidavit did not list the alleged representation of cancelable-at-will as one of the false statements on which he relied in signing the Marketing Agreement. If he had, I would find that Amer's reliance on such a false statement is not justifiable in light of Mr. Amer's signature on the inconsistent written Agreement.

[27] Amer disputed Astonish's Undisputed Fact ¶ 299, which states that Amer has continued to get leads, relying on Mr. Amer's testimony, which is confirmed by Mr. Tennent. Amer Dep. at 44; Tennent Dep. at 82-84. In asserting that this fact is disputed, it relies on its First Amended Complaint and its attorney's cancelation letter, neither of which deal with Amer's ongoing receipt of leads. I treat the fact as undisputed.

To recap, while the Marketing Agreement is sloppy on this important point, its drafting error does not permit reasonable minds to read it more than one way with respect to the right to cancel.  See In re Chiodetti, 163 B.R. 6, 9 (Bankr. D. Mass. 1994) ("the language of the mortgage controls the outcome of the case and is unambiguous, though poorly drafted"); Boston Helicopter Charter, Inc. v. Agusta Aviation Corp., 767 F. Supp. 363, 370 n.7 (D. Mass. 1991) (poorly drafted contract still unambiguous).  Rather, the Agreement, read holistically, circumscribes a five-year term, not cancelable except on notice sixty days before its expiration. While Amer clearly regrets tying itself to Astonish for so long, that is the bargain that it made and must live with.  I recommend that summary judgment in favor of Astonish and against Amer on Count VIII to the extent that it seeks a declaration that the Marketing Agreement is cancelable at will and was properly canceled.

### 4.    **Mistake**

Amer alternatively argues that the Marketing Agreement is voidable due to the scrivener's error – plainly a mistake – in placing the Initial Term above rather than below the non-cancelation clause.  I dispose of this claim briefly.  The law provides that, when parties have made a mutual mistake with regard to an essential element of an agreement, the agreement is voidable by the adversely affected party.  Wilson v. HSBC Mortg. Servs., Inc., 744 F.3d 1, 1 (1st Cir. 2014); see Marini v. Mut. Ben. Health & Accident Ass'n, 33 A.2d 193, 196-97 (R.I. 1943). "A mutual mistake is 'one that is 'common to both parties wherein each labors under a misconception respecting the *same terms* of the written agreement sought to be [reformed].'" Esposito v. Esposito, 38 A.3d 1, 5 (R.I. 2012) (quoting Merrimack Mut. Fire Ins. Co. v. Dufault, 958 A.2d 620, 624 (R.I. 2008) and McEntee v. Davis, 861 A.2d 459, 463 (R.I. 2004)).  There is no evidence that there was such a mutual mistake here – the Marketing Agreement states that it

is non-cancelable and Astonish understood that it is non-cancelable.  175 Post Rd., LLC, 851

A.2d at 274 (reliance on report at variance with written agreement with integration clause is

unilateral mistake, not mutual).  If Amer had a different understanding, that is a unilateral

mistake that does not render the Agreement voidable.  Accordingly I recommend that this Court

enter summary judgment in favor of Astonish on Amer's claim in Count VIII that the Marketing

Agreement is unenforceable due to a mutual mistake.

### 5.        Vague, Ambiguous, or Indefinite

Count VIII of Amer's First Amended Complaint asks this Court to declare the Marketing

Agreement unenforceable because it is vague, ambiguous and indefinite; Astonish challenges the

legal viability of this claim.  In Amer's motion, it argues only that the Marketing Agreement

should be found to be so ambiguous as to be unenforceable based on its failure to precisely spell

out every detail of what is covered, instead providing, for example, that the listed services are

"just some of the tools Astonish provides."  ECF No. 17-1 at 7.

Amer's void for vagueness claim clashes with the iconic holding of Judge Cardozo from

nearly a century ago:

> The law has outgrown its primitive stage of formalism when the precise word was
> the sovereign talisman, and every slip was fatal.  It takes a broader view today.  A
> promise may be lacking, and yet the whole writing may be "instinct with an
> obligation," imperfectly expressed . . .  If that is so, there is a contract.

Wood v. Lucy, Lady Duff-Gordon, 118 N.E. 214, 214 (N.Y. 1917) (Cardozo, J); see also

Acinapura, 2003 WL 22048717, at *3-4.  I find that the Marketing Agreement is "instinct with

obligation," obligations that both Amer and Astonish have at least partially discharged, Amer by

paying the upfront price, Astonish by providing a functional website, consulting on search

engine rankings and beginning the delivery of the other components of its service.  Accordingly,

Astonish's motion for summary judgment as to this claim in Count VIII should be granted.

### 6.    No Meeting of the Minds

Amer's final rescission argument tosses back up all of the same facts that underpin its

many arguments for rescission and contends that they collectively expose a "fundamental

misunderstanding" as to what it had bargained for so profound as to compel the conclusion that

there was no meeting of the minds.  Accordingly, it argues that the Marketing Agreement must

be rescinded.  While Amer is right that meeting of the minds is an essential element of a valid

contract, DeAngelis v. DeAngelis, 923 A.2d 1274, 1279 (R.I. 2007) (quoting R.I. Five v. Med.

Assocs. of Bristol Cnty, Inc., 668 A.2d 1250, 1253 (R.I. 1996)), it does not follow that a contract

is voidable when there was no fraud in the inducement, no mutual mistake, and it is not

unconscionable or hopelessly vague and indefinite.  Put differently, where Amer's contract-

avoiding claims fail when each is examined individually, the cumulative weight of all of the

failed claims cannot lead to a different result.  On the other hand, Amer is legally entitled to

expect that it was going to get all that was promised by the Agreement; if Astonish failed to

deliver, Amer's remedy is based on the breach.  It may not rescind because there was no meeting

of the minds.

### D.    Breach of Fiduciary Duty Based on "Partnership"

Amer charges Astonish with breach of a fiduciary duty that it contends arose because of

the colloquial use of the term "partner" in the Project Proposal and in some of Astonish's

marketing materials.  See DSUF ¶ 241.  Amer claims that Astonish breached this fiduciary duty

by signing Marketing Agreements with other insurance agencies, including others with which

Amer competes, in violation of a duty not to do business with competing insurance agencies.

Rhode Island law defines a partnership as an "association of two or more persons to carry

on as co-owners of a business for profit."  R.I. Gen. Laws § 7-12-17.  The use of the term

"partnership" in a colloquial sense in a business relationship does not establish a legal partnership. Southex Exhibitions, Inc. v. R.I. Builders Assoc., Inc., 279 F.3d 94, 101-03 (1st Cir. 2002); T.G. Plastics, 958 F. Supp. 2d at 327-28. A party owes a fiduciary duty to another, independent of a legal partnership, when one "rightfully reposes trust and confidence in another" and the parties acted "as partners in a business venture for mutual profit or loss." A. Teixeira & Co., Inc. v. Teixeira, 699 A.2d 1383, 1387 (R.I. 1997). Further, whether a partnership exists or fiduciary duty arises depends on the totality of the factual circumstances, on which Amer as the claimant has the burden of persuasion. T.G. Plastics, 958 F. Supp. 2d at 327.

Amer's claim of fiduciary duty based on "partnership" borders on frivolous – Mr. Amer adamantly denied a legal "partnership" with Astonish at his deposition. Amer Dep. at 53; DSUF ¶¶ 241-42. The Marketing Agreement expressly rules it out. ECF No. 17-1 at 3 ¶ 15 ("There is no relationship of partnership . . . ."). I find, as a matter of law, that the Marketing Agreement between Astonish and the Agency is neither a partnership nor a relationship that gives rise to a fiduciary relationship. See Indus. Gen. Corp. v. Sequoia Pac. Sys. Corp., 44 F.3d 40, 44 (1st Cir. 1995) ("business transactions conducted at arm's length generally do not give rise to fiduciary relationships"); see also Southex Exhibitions, Inc., 279 F.3d at 99-101 (no partnership when parties use the word "partner" colloquially and no evidence of intent to enter into partnership). Amer's claim that Astonish owed it a duty not to do business with its competitors is equally without merit – Amer's introduction to Astonish came from a competing Ohio agency with which Astonish was doing business and the first paragraph of Astonish's Project Proposal touts itself as "currently represent[ing] hundreds of insurance agencies across the country." ECF No 17-1 at 6. The undisputed evidence establishes that Astonish's contractual relationships with hundreds of other agencies was one of its selling points.

With no evidence to suggest either the existence of a legal partnership or any foundation for imposing a fiduciary duty, I recommend that judgment should enter in favor of Astonish and against Amer on Amer's claims in Count VII and Count VIII that Astonish breached a fiduciary duty owed to Amer.

**E.**     **Breach of Contract and Covenant of Good Faith and Fair Dealing.**

The next bend in this road brings the Court (at last) face to face with Amer's many breach of contract claims. Mr. Amer's testimony sets out ways that he believes Astonish failed to provide Amer with what it had promised in the Marketing Agreement: failure to take care of social media, failure to procure email lists and set up email marketing campaigns; failure to upload data onto the Astonish system; confusion over who pays for pay-per-click; and failure to provide a competent Raving Fan Manager. Amer Dep. at 19, 21, 27, 45-47, 81.

There is a threshold problem with Amer's breach of contract claims. By contrast with Mr. Amer's testimony, Amer's motion asserts that its breach of contract claims rely on the same proof that buttressed its claims of fraud in the inducement – that is, every alleged contract-inducing lie is also a promise based on the Marketing Agreement amplified by that same parol evidence that constitutes the lie. ECF No. 55-1 at 25-26. This attempt to transmute the fraud claims into breach of contract claims does not work for the claimed false statements that fail as a matter of law because they are inconsistent with the Marketing Agreement. An oral "promise" contradicted by a written agreement with an integration clause is not part of the binding agreement and may not be the subject of a claim for breach. See Samos v. 43 E. Realty Corp., 811 A.2d 642, 643 (R.I. 2002). To the extent that Amer presses failed fraud theories as grounds for breach of contract, I recommend that summary judgment be granted in favor of Astonish.[28]

---

[28] Because Amer's breach of contract presentation in the motion piggy-backs its fraud-in-the-inducement argument, Astonish asks this Court to preclude Amer from going forward on any breach of contract claims pursuant to Fed. R.

The substantive breach of contract analysis must begin with the language of the written Marketing Agreement – examining each claim individually, this Court must determine what the Agreement promised, whether the language of the promise is ambiguous, permitting consideration of parol evidence, and whether Amer has pointed to disputed facts sufficient to establish that Astonish materially breached that promise. See Barkan v. Dunkin Donuts, Inc., 627 F.3d 34, 39 (1st Cir. 2010). To scramble through the parties' motions on breach of contract, I break them into two separate analytical exercises. First, I separately examine Amer's claim that Astonish's performance of the promise of a website was a breach of what was promised by the Marketing Agreement; then, I look at the remaining breach of contract claims, focusing on those that Mr. Amer referred to in his deposition testimony.

### 1.     Breach of Contract – Website

Distinctly different from the fraud claim grounded on the alleged promise that Astonish would supply a "unique" website entirely unlike those viewed by Mr. Amer during due diligence before he signed the Marketing Agreement is Amer's allegation that Astonish failed to supply a website as agreed. Analysis of this breach of contract claim begins with the Agreement, which promises a customized website built on a "Content Management System." ECF No. 17-1 at 2, 7. The undisputed evidence further establishes that Astonish communicated what the promised site would look and feel like to prospective customers by directing them to look at other websites Astonish had built for other customers, which Amer did. Amer Dep. at 7-8, 12, 15; DSUF ¶ 49.

---

Civ. P. 37, contending that its interrogatory answers refer only to outright failure to deliver pursuant to oral promises, and not to deficiencies in the performance of the promises in the Marketing Agreement. I reject this approach. Whatever defects may afflict Amer's interrogatory answers, Mr. Amer's deposition is chock-a-block full of his dissatisfaction with Astonish's performance of what Amer was promised by the Marketing Agreement. It provides Astonish with more than adequate notice of Amer's contract breach claims. The draconian sanction Astonish requests is not appropriate. See Harriman v. Hancock Cnty., 627 F.3d 22, 30 (1st Cir. 2010).

Material to Amer's breach of contract claim that it did not get the website it was promised is the provision of the Marketing Agreement that provides:

> Client shall be deemed to have accepted the Equipment and/or Software License if it fails to notify Astonish within 10 days of delivery that it has not accepted the Virtual Insurance Office [website]. Client will not unreasonably withhold or delay its acceptance.

ECF No. 17-1 at 2. The Agreement defines "delivery" as being deemed complete upon Amer's direction to Astonish to make the website accessible to the general public. ECF No. 17-1 at 2. The undisputed evidence establishes that Astonish began work on the website as soon as the Marketing Agreement was signed, that Mr. Amer participated fully in the design of the website, and had many suggestions, which were implemented. DSUF ¶¶ 53-54. After the website went live with his approval on December 19, 2011, he had no other objections and never notified Astonish that Amer had not accepted it. DSUF ¶¶ 51-54; Amer Dep. at 52. Mr. Amer affirmed that the website offers accurate information, allows the Agency to collect email addresses, and has not malfunctioned in any way. DSUF ¶ 58; Amer Dep. 61. His co-owner, Mr. Tennent testified that there was nothing about the level (or lack) of customization to the website that has caused any harm to Amer. Tennent Dep. at 54. In short, the undisputed evidence establishes that Amer had and has no complaints about the website it received under the Marketing Agreement; it never gave Astonish notice that the site was not accepted. Under the terms of the Agreement requiring notice of non-acceptance within ten days of launch, Amer accepted the website and cannot now claim breach. See Univ. Emergency Med. Found. v. Rapier Invs., Ltd., 197 F.3d 18, 20-24 (1st Cir. 1999) (notice provision to terminate service contract strictly interpreted); cf. Crest Mfg. Co. v. Whittet-Higgins Co., No. 91-0982, 1992 WL 813497, at *2 (R.I. Super. Ct. Jan. 17, 1992) (if plaintiff accepted shipments, it is contractually obligated to pay; applying Uniform Commercial Code).

Also material is the undisputed evidence clearly establishing that, before he signed the Marketing Agreement, Mr. Amer was well aware of what Astonish-built websites looked like and well aware that Astonish had built websites for hundreds of agencies, including agencies in Ohio. The only dissatisfaction with Amer's Astonish-built website that is factually supported in the record on these motions is that it is not unique, but rather shares features with other Astonish websites. Put differently, apart from similarities with other Astonish-built sites, it is undisputed that Amer has no complaints. This is buyer's remorse, not breach of contract. Women's Dev. Corp., 764 A.2d at 160 (where party never complained until it sued, breach of contract claim is post-hoc rationalization).

Amer has presented no evidence establishing that Astonish did not provide exactly what it promised, a customized website sharing features and the look and feel of others that Astonish built. I recommend that summary judgment be granted in favor of Astonish with respect to Amer's breach of contract claim based on dissatisfaction with the website that Amer accepted and still uses pursuant to the Marketing Agreement.

## 2. Other Breach of Contract Claims

At the core of the remainder of Amer's breach of contract claims is Astonish's promise Amer would get a dedicated "Raving Fan Manager;" Astonish's initial attempt at performing that promise was flawed by the poor job performance of the person assigned the role. As a result, Amer was deeply dissatisfied with the services delivered in the initial months of the Marketing Agreement with respect to the level of support provided by Astonish for search engine ranking, social media and blogging, email marketing and uploading Amer's customer data to the Astonish system.

Astonish concedes the incompetence of Amer's Raving Fan Manager, but points out that as soon as Amer complained, she was replaced. Astonish also argues that, during the brief period before Amer repudiated, it was providing tepid assistance, in breach of its duty. Astonish contends that Amer's lack of engagement, and not the poor performance of the Raving Fan Manager, was the cause of most of the problems of which it now complains. Astonish claims that it substantially performed, promptly cured when Amer complained and that any defects in its performance are insufficient to justify Amer's decision to repudiate. See URI Cogeneration Partners, L.P. v. Bd. of Governors for Higher Educ., 915 F. Supp. 1267, 1284 (D.R.I. 1996) (when contract calls for exchange of performances, substantial performance by one is condition precedent to other's duty to render return performance); Russell v. Salve Regina Coll., 938 F.2d 315, 317 (1st Cir. 1991) (if student "substantially performed" her side of bargain, college's decision to expel her constituted breach).

These claims present a factual quagmire to be untangled by a fact finder. Barkan v. Dunkin' Donuts, Inc., C.A. No. 05-050L, 2009 WL 2957852, at *12 (D.R.I. Sept. 15, 2009). A fact finder must determine whether the poor performance of the Raving Fan Manager amounted to a breach, whether Amer's half-hearted embrace of the Astonish system constituted a breach or excused Astonish's further performance, whether Amer's repudiation was premature and itself constitutes a breach or whether it merely cuts off Amer's damages for Astonish's breach. See Nat'l Chain Co. v. Campbell, 487 A.2d 132, 135 (R.I. 1985) (whether there has been substantial performance is a question of fact for jury relying on all relevant evidence); see also Thompson v. Thompson, 495 A.2d 678, 682 (R.I. 1985) ("[I]n order to give rise to an anticipatory breach of contract, the defendant's refusal to perform must have been positive and unconditional.") (quoting 11 Williston on Contracts § 1322 at 130 (3d ed. Jaeger 1968)).

A secondary breach of contract claim arises from Amer's claim that it did not receive "pay-per-click" without additional charge, which it believes it was promised.  This provision of the Marketing Agreement is susceptible to competing interpretations with respect to who pays for "pay-per-click" over the life of the Marketing Agreement, so that oral testimony may be admitted to aid in interpretation.  See T.G. Plastics, 958 F. Supp. 2d at 324-25 (disagreement on interpretation of how to charge for transportation creates genuine issue of fact for trial).  While there is no evidence that Amer ever wanted pay-per-click marketing to be purchased for it, with its less than competent Raving Fan Manager during the critical first ninety days, a fact finder must determine what it was supposed to get and whether there was a breach or whether its failure to ask for pay-per-click followed by its repudiation cuts off its ability to recover.  See Restatement (Second) of Contracts § 253(1) & cmt. b (repudiation gives rise to damages for total breach).

In addition to its breach of contract claims, Amer has a separate claim for breach of the covenant of good faith and fair dealing.  "Under Rhode Island law, 'it is well settled that there is an 'implied covenant of good faith and fair dealing between parties . . . so that the contractual objectives may be achieved.''"  T.G. Plastics, 958 F. Supp. 2d at 324-25 (quoting Saccucci Auto Grp., Inc. v. Am. Honda Motor Co., Inc., 617 F.3d 14, 26-27 (1st Cir. 2010)).  Such a claim based on contract law may lie for expectation damages from a party who failed to use best efforts to fulfill a promise.  Russell, 649 F. Supp. at 399.  The core issue is whether the party's behavior was unreasonable or arbitrary, viewed against the backdrop of the contractual objectives.  Hord Corp. v. Polymer Research Corp. of Am., 275 F. Supp. 2d 229, 238 (D.R.I. 2003); Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 66 F. Supp. 2d 317, 329 (D.R.I. 1999).  When the objectives of the contract are at the core of the disputed facts, summary judgment on the covenant of good

faith and fair dealing is inappropriate.  Lifespan/Physicians Prof'l Servs. Org., Inc. v. Combined Ins. Co. of Am., 345 F. Supp. 2d 214, 225 (D.R.I. 2004).

In sum, Amer has presented sufficient evidence to buttress its claims of breach of contract and breach of the covenant of good faith and fair dealing arising from the inadequate performance of the Raving Fan Manager, with respect to search engine ranking, social media and blogging, email marketing and uploading Amer's customer data to the Astonish system, and from its claimed entitlement to pay-per-click without additional charge.  All of these claims are the subject of material factual disputes.  Accordingly, I recommend that the competing motions for summary judgment by Astonish against Amer and by Amer against Astonish on Amer's breach of contract and good faith and fair dealing claims should be denied.

### F.       Astonish's Counterclaim

Astonish has asserted a counterclaim against Amer, alleging breach of contract and breach of the implied covenant of good faith and fair dealing arising from Amer's alleged failure to comply with its contractual promise to "devote substantial effort assisting Astonish in good faith with the design, development and production" of the Astonish web-based marketing system.  ECF No. 17-1 at 2.  Conceding that Amer's upfront payment of the entire contract price precludes it from proving lost profits as damages,[29] Astonish seeks recovery of its attorney's fees pursuant to the provision of the Marketing Agreement that requires that Amer "pay all costs and expenses, including reasonable attorney's fees in connection with the protection of [sic] enforcement of any of Astonish's rights against [Amer] . . . ."  ECF No. 17-1 at 3.

In support of its counterclaim, Astonish proffers many competent facts from which a fact finder could conclude that Amer's leadership (particularly Mr. Tennent) and many of its

---

[29] Astonish argues it will have compensable damages if this Court awards damages to Amer.  This makes no sense. Astonish cannot recover damages based on an injury to another caused by its misconduct.

employees resisted implementation of the Astonish system, refusing to make any effort and undermining the efforts of those who did attempt to discharge Amer's duty. DSUF ¶¶ 40-42 (Mr. Tennent not interested in use of Astonish system), ¶¶ 90-105 (most Amer employees refused training, noting "bad attitude" towards Astonish program), ¶ 113 (some of delay with launching email campaigns caused by failure of Amer's email lists to pass Google verification), ¶¶ 135-46 (most of delay with VPC upload caused by Amer's lack of commitment of employees properly licensed and qualified to deal with data). Whether this conduct constitutes a breach by Amer is hotly disputed; Amer counters with references to the poor performance of Amer's Raving Fan Manager. PSDF ¶¶ 93-95, 102, 104. Further, it is undisputed that Amer repudiated when it stopped working with Astonish by May 2012, if not sooner. DSUF ¶¶ 122-23.

Amer acknowledges that there is a material issue of disputed fact with respect to the merits of Astonish's counterclaim, but argues that the counterclaim fails as a matter of law because Astonish has no damages. This argument founders in the face of the well-settled principle of Rhode Island law that nominal damages may be awarded for breach of contract, even if no actual damage or loss can be proven. Gallagher v. Poignies, 90 A.2d 413, 415 (R.I. 1952); Parking Co., L.P. v. R.I. Airport Corp., P.B. 2004-4189, 2005 WL 419827, at *5 (R.I. Super. Ct. Feb. 18, 2005) (citing Restatement (Second) of Contracts § 346). As a well-respected treatise states:

> An unexcused failure to perform a contract is a legal wrong. An action will therefore lie for the breach although it causes no injury. Nominal damages may then be awarded.

24 Williston on Contracts § 64:6 (4th ed. 2014); see also 11 Corbin on Contracts § 55.10 (Rev. ed. 2013) ("[F]or every breach of contract, a cause of action exists. . . . If the aggrieved party has suffered no compensable damages, a judgment for nominal damages will be entered."). Other

jurisdictions recognize this principle. W. Insulation, LP v. Moore, 316 F. App'x 291, 294, 298 (4th Cir. 2009); FCE Benefit Adm'rs, Inc. v. George Washington Univ., 209 F. Supp. 2d 232, 243-44 (D.D.C. 2002); see Chronister Oil Co. v. Unocal Ref. & Mktg., 34 F.3d 462, 466 (7th Cir. 1994) (Posner, C.J.) ("for reasons we do not understand every victim of a breach of contract, unlike a tort victim, is entitled" to nominal damages). Accordingly, Amer's motion for summary judgment on Astonish's counterclaim based on the lack of damage fails as a matter of law. Sandonato, 2010 WL 8461122, at *6 (counterclaim survives summary judgment because claimant may be awarded nominal damages).

A more complex question is presented by Astonish's contractual claim of entitlement to attorney's fees. Some courts have held that a contract clause mandating an award of fees to the "prevailing" party does not apply to a litigant that has recovered only nominal damages. See, e.g., W. Insulation, LP, 362 F. App'x at 379; Versata Software, Inc. v. Internet Brands, Inc., 902 F. Supp. 2d 841, 864-65 (E.D. Tex. 2012) (listing cases). The proper starting point for this inquiry is the language of the contract. See Quill Co., Inc. v. A.T. Cross Co., 477 A.2d 939, 942-44 (R.I. 1984) (contract language governs right of recovery of attorney's fees for successful defense of claim of breach). Here, the Marketing Agreement does not provide that attorney's fees should be awarded to a "prevailing" party; rather, Astonish is entitled to an award of reasonable fees if it spent them in the "protection of [sic] enforcement of any of Astonish's rights against [Amer] . . . ." ECF No. 17-1 at 3 ¶ 15. This clause is plain: Astonish's successful defense of itself against Amer's claims of fraud and breach of contract clearly would amount to the protection of a right, as would Astonish's success in establishing that either Amer's failure to assist or Amer's repudiation constitutes a breach. See Sandonato, 2012 WL 718720, at *6 (when there is breach of contract, in absence of actual damage, law vindicates right by awarding

nominal damages) (quoting <u>Nappe v. Anschelewitz, Barr, Ansell & Bonello</u>, 477 A.2d 1224, 1228 (N.J. 1984)). In either instance, attorney's fees would be recoverable in connection with Astonish's counterclaim.

Based on the foregoing, I recommend that Amer's motion for summary judgment on Astonish's counterclaim should be denied both with respect to the merits of the counterclaim and its prayer for recovery of attorney's fees.

## III.  <u>CONCLUSION</u>

I recommend that Astonish's Motion for Partial Summary Judgment (ECF No. 53) be GRANTED IN PART AND DENIED IN PART and Amer's Cross-Motion for Summary Judgment (ECF No. 55) be DENIED. Summary judgment should enter in favor of Astonish on the following claims in Amer's First Amended Complaint:

- Breach of Contract (Count V of the First Amended Complaint) and Violation of Covenant of Good Faith and Fair Dealing (Count X of the First Amended Complaint) to the extent they are based on dissatisfaction with the website provided by Astonish;

- Fraud in the Inducement (Counts VI and IX of the First Amended Complaint) for all theories of misrepresentation advanced by Amer;

- Breach of Fiduciary Duty (Count VII of the First Amended Complaint);

- Declaratory Relief (Count VIII of the First Amended Complaint); and

- Action for Rescission (Count IX of the First Amended Complaint).

I further find that genuine disputes of material fact exist for the following claims and recommend that they proceed to trial:

- Amer's Breach of Contract (Count V of the First Amended Complaint) and Violation of the Covenant of Good Faith and Fair Dealing (Count X of the First Amended Complaint) claims to the extent they are based on:

  - performance of the Raving Fan Manager;

- o assistance with social media, blogging, search engine ranking, email marketing and uploading Amer's customer data to the Astonish system; and
  - o entitlement to pay-per-click without additional charge.

- Counts I and II of Astonish's counterclaim, for Breach of Contract and Breach of the Implied Covenant of Good Faith and Fair Dealing.

Any objection to this report and recommendation must be specific and must be served and filed with the Clerk of the Court within fourteen (14) days after its service on the objecting party.  See Fed. R. Civ. P. 72(b)(2); DRI LR Cv 72(d).  Failure to file specific objections in a timely manner constitutes waiver of the right to review by the district judge and the right to appeal the Court's decision.  See United States v. Lugo Guerrero, 524 F.3d 5, 14 (1st Cir. 2008); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 605 (1st Cir. 1980).


/s/ Patricia A. Sullivan
PATRICIA A. SULLIVAN
United States Magistrate Judge
May 23, 2014